DOCKETED
APR 0 3 2002

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

THE CHAMBERLAIN GROUP, INC.,    )
    )
   Plaintiff/Counterclaim-Defendant,    )
    )    Case No. 01 CV 6157
    v.    )
    )    Hon. Suzanne B. Conlon
INTERLOGIX, INC.,    )    Magistrate Judge Michael T. Mason
    )
   Defendant/Counterclaim-Plaintiff.    )

## INTERLOGIX'S OPPOSITION TO CHAMBERLAIN'S
## MOTION TO STRIKE EXPERT REPORTS AND EXCLUDE
## EXPERT TESTIMONY

FILED
APR 2 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

GOODWIN PROCTER LLP
Paul F. Ware, Jr.
John C. Englander
J. Anthony Downs
Goodwin Procter LLP
Exchange Place, 17th Floor
Boston, Massachusetts 02109
(617) 570-1000

MAYER, BROWN, ROWE & MAW
Sheila Finnegan
Vincent J. Connelly
Mayer, Brown, Rowe & Maw
190 South LaSalle Street
Chicago, Illinois 60603
(312) 782-0600

*Counsel for Defendant/Counterclaim-Plaintiff Interlogix, Inc.*

Interlogix, Inc. ("Interlogix") hereby opposes Chamberlain's Motion to Strike Expert Reports and Exclude Expert Testimony on three principal grounds.

First, contrary to Chamberlain's assertion, the testimony of Interlogix's experts is not "redundant," nor does Mr. Nixon's testimony amount to inadmissible testimony on purely legal issues. This is a patent case. By it, Chamberlain seeks to apply its patents on a remotely-controlled garage door opener to GE-Interlogix's security systems. The subject matter is complex (including wireless transmission technology, software algorithms used for storing codes in memory, and multiple different allegedly infringing security system devices). The history of the two "reissue" patents at issue is also complex (15 years of prosecution history, multiple applications and reissues, appeals, and prior litigation over the relevant claims). The jury and this Court will benefit from testimony by experts to explain, interpret and put in context such complexity. Accordingly, in compliance with this Court's scheduling order, Interlogix properly submitted reports for the following experts, each covering distinct subject matters:

(i)     Dr. William Frey, *on non-infringement*, to explain why Interlogix's wireless security products do not infringe the Chamberlain patents, and to provide the perspective of a person of skill in the art as to how certain language in the patents would be understood;

(ii)     Dr. Sharad Malik, *on invalidity*, to describe how certain prior art renders Chamberlain's remotely-operated garage door patents invalid as anticipated or obvious;

(iii)     Larry Nixon, *on the prosecution history*, to interpret and explain for the jury and the Court the complex prosecution history of the two "reissue" patents, and to explain the meaning and import of statements and disclaimers made by Chamberlain during that prosecution history and during related litigation;

1

(iv)     Charles Kuyk, *an accountant*, to put in context the nature of Interlogix's finances and its business and to critique in detail the opinion offered by Chamberlain's accountant/damages witness on "reasonable royalty" issues; and

(v)     Dr. Gerald Hausman, *an economist*, to discuss the marketplace dynamics and economics that would drive a hypothetical royalty negotiation and set forth an opinion as to the outcome of that negotiation.

Each of these witnesses is qualified to provide expert testimony; Chamberlain concedes this. Moreover, the reports of each witness plainly show that each is different and that each covers distinct subject matters.[1] The possible exception is that Mr. Kuyk and Dr. Hausman – through different routes of analysis – each offer an opinion as to the "reasonable royalty" that would be applied if any Interlogix products are found to infringe. Their opinions on this issue are not the same. Moreover, the remainder of their testimony is different in subject matter and scope. Some limited overlap on royalty issues should be permitted in this case because, as stated below, it will assist the jury in deciding complex damages-related issues. In short, the testimony set forth in these reports is plainly admissible under the Federal and Local Rules.

Second, this Court should use its discretion to defer the issues raised by this premature motion. Discovery does not close until May 15. The claims of the patents have not yet been construed. Chamberlain has not even provided a claim chart that sets forth its claim construction and theories of infringement, as ordered by the Magistrate Judge and confirmed by this Court in its March 26, 2002 Order. Moreover, Interlogix expects to move for summary judgment on May 15th. For this Court to strike any expert testimony, it would have to review the reports in detail and make a determination now as to whether the testimony would be admissible at trial. It

---

[1]     The reports are attached as exhibits to Chamberlain's motion, and Interlogix will refer here to those exhibits as "Chamberlain Exhibit __."

2

makes no sense to do this until the Court goes through the claim construction/summary judgment process and determines what, if any, issues remain for trial. Most likely, this is why the Local Rule concerning experts is contained in the standard pre-trial order, and why the admissibility of expert testimony is usually decided in the context of a motion *in limine* shortly before trial.

Third, as Interlogix stated in its Request for a Briefing Schedule on this motion (filed March 18, 2002), Interlogix strongly objects to Chamberlain's effort to use this motion to claim a right to designate more experts in this case, and to get more time to name those experts. For the reasons stated in our Request, the Court's Scheduling Order required Chamberlain – as the plaintiff in this case – to identify on February 4th all the persons it may call at trial as an expert.[2] The Court's Order did not give Chamberlain the right to hold back on experts, and then name new or additional experts – and add further testimony – after Interlogix submitted its reports. Such a process would significantly prejudice Interlogix, as plaintiff Chamberlain would effectively have withheld the heart of its case – its expert opinions – until discovery is almost over. Interlogix should not be required to take and defend the remaining fact discovery without Chamberlain having timely disclosed its expert testimony or the identity of its witnesses.[3] This Court should thus confirm that Chamberlain **is limited to the expert witnesses and expert testimony previously disclosed on February 4th.**

At a minimum, this Court should deny Chamberlain's request for an additional 30 days to disclose "rebuttal" reports after the present Motion to Strike is decided. Chamberlain has already

---

[2]    The Court's Order explicitly required Chamberlain to have designated all its potential experts "pursuant to Federal Rules of Civil Procedure 26(a)(2)" on February 4, and Interlogix to designate its experts on March 4. No further experts or rebuttal were provided for, and Rule 26(a)(2)(C) explicitly states that expert "disclosures shall be made at the times and in the sequence directed by the court."

[3]    Indeed, Chamberlain is *already* moving to add another new expert into this case (see Chamberlain's Motion to Designate Dr. V. Thomas Rhyne, filed March 18, 2002), but it has not disclosed what Dr. Rhyne would say. Chamberlain is thus treating expert disclosure as a tactical game, in which it does not have to live by this Court's order, but can continually supplement or add to its experts.

had Interlogix's expert reports for a month, and with discovery ending on May 15, such an

extension would effectively preclude Interlogix from knowing Chamberlain's expert opinions or

obtaining meaningful discovery about any such opinions.

## BACKGROUND

This case involves two related patents (Reissue Patent No. 35,364 and Reissue Patent No.

36,703) for a microprocessor-controlled garage door opener that uses a particular RF (wireless)

transmission scheme and that requires the use of, among other things, a particular software

algorithm to store certain codes in memory. These two patents are "reissues" of another patent,

No. 4,750,118, that issued from a patent application first filed in 1985. The title of the '118

patent is "Coding System for Multiple Transmitters and a Single Receiver **for a Garage Door**

**Opener**" (emphasis added), and the patent itself states: "This invention relates in general to

garage door operators and in particular to a novel garage door operator ..." Chamberlain's suit

against Interlogix does not claim that Interlogix infringes the original '118 patent, but that it

infringes the two reissue patents, which were issued by the Patent Office in 1996 (the '364

Patent) and in 2000 (the '703 patent).

These two reissue patents cannot be construed and compared to Interlogix's products

without understanding a long and involved prosecution history that spans over 15 years (and

thousands of pages of submissions) in the Patent Office. The history includes not only the Patent

Office proceedings, but also an appeal by Chamberlain to the Board of Patent Appeals and

multiple lawsuits, one of which culminated in a 1999 Federal Circuit decision, *Overhead Door v.*

*The Chamberlain Group*, 194 F.3d 1261 (Fed. Cir. 1999). During these proceedings, plaintiff

Chamberlain made numerous admissions, disclaimers and arguments that affect the nature and

4

scope of the patent claims that this Court must construe and apply. Chamberlain also made statements that amount to inequitable conduct that should invalidate the patents.

Among the statements repeatedly made by Chamberlain was that the invention disclosed in the original specification and subsequently claimed in the reissue patents was a remotely controlled garage door opener. (Chamberlain made this limiting statement to overcome invalidating prior art that came from outside the garage door industry, including art pertaining to security systems.) The Board of Patent Appeals agreed that "[t]he invention is directed to remote control garage door openers." Decision of 11/4/99 (Exhibit 1 hereto). The Federal Circuit also agreed: "The '364 patent claims improvements on remote control systems for garage door openers." *Overhead Door*, 194 F.3d at 1264. These statements – and others – limit the patent to garage door openers, and further to a particular type of wireless system for garage door openers. The patent history is thus important, because Chamberlain now seeks to impermissibly expand the scope of its patent rights to any type of remotely operated system that operates "equipment." That is, Chamberlain seeks to cover products that are not within the scope of the original invention, including products that Chamberlain itself disclaimed during the patent prosecution.

Rather than garage door openers, Interlogix sells security systems which include, in some systems, wireless sensors that transmit data to a central receiver. The sensors can be mounted to windows or doors to detect an unauthorized entry, or can consist of smoke or carbon monoxide detectors. Interlogix expects to prove that its security systems are outside the scope of the claims of the reissue patents, as properly construed and applied in light of Chamberlain's own past statements and admissions.

Moreover, Interlogix expects to prove that the various Interlogix products do not infringe because they have technical features that distinguish the Interlogix systems from the particular

technology claimed in the Chamberlain patents. Those differences include substantial differences in the way that Interlogix products perform the "switching" required in the Chamberlain patents, and differences in the way Interlogix's products transmit and store the code information that is used to identify the various sensors in the system.

In addition to its non-infringement defenses, Interlogix will also prove that the Chamberlain patents are invalid because they are anticipated or made obvious by prior art dating back to the late 1970s and early 1980s. Chamberlain also made various false and misleading statements to the Patent Office during the prosecution of the patents; those statements amount to invalidating inequitable conduct.

To fairly and fully understand each of Interlogix's defenses, the finder of fact must comprehend (1) the technological aspects of the invention claimed by Chamberlain's patents; (2) the complex details of how Interlogix's products work and why they differ from the claimed invention; (3) how Chamberlain's patents relate to previously existing technology in the art in the late 1970's and early 1980's; and (4) how Chamberlain came to obtain the patents through the complex "reissue" process, and how Chamberlain's own multiple applications, amendments, and admissions caused the claim language of the reissue patents to have a particular scope and meaning. Furthermore, if Interlogix should be found liable for patent infringement, the finder of fact must be able to understand (5) the economics of the garage door and home security markets in general, and the businesses of Interlogix and Chamberlain in particular; (6) how a hypothetical licensing negotiation between Chamberlain and Interlogix would have played out; and (7) the reasons why the conclusions of Chamberlain's accountant/damages expert are seriously flawed.

## ARGUMENT

**I.    MR. NIXON'S TESTIMONY IS DIRECTED TO EXPLAINING THE COMPLEX PROSECUTION HISTORY, NOT TO EXPLAINING PATENT LAW.**

The first part of Chamberlain's argument is devoted to attacking the expert report of Mr. Nixon. To do so, Chamberlain falsely characterizes Mr. Nixon's testimony, which this Court can read for itself in Chamberlain's Exhibit 1, as merely "parroting patent law concepts in broad, conclusory terms that are ordinarily explained in jury instructions." [4]

Mr. Nixon, however, is not being offered to provide the "purely legal testimony" that courts have rejected in the cases cited by Chamberlain. Rather, Mr. Nixon is offered to help the Court and the jury to understand the complex patent prosecution history involved in this case from the perspective of a person of skill in the art. As explained above, and as described in Mr. Nixon's report, the two reissue patents in this case are the product of some 15 years of patent filings, reissue requests, amendments, appeals, and other litigation. Much of the information contained in the prosecution history documents is technical in nature, but critically important to this case. The jury (or this Court) could ultimately hear and decide issues relating to whether statements made in the patent prosecution were intentionally false and misleading *in context*; whether Chamberlain has narrowed the scope of its patents by making certain statements, arguments or amendments *in context*; and how and when the Patent Office (and Chamberlain) treated certain pieces of prior art. All these issues require an informed and nuanced understanding of the patent prosecution.

---

[4]    Specifically, Chamberlain claims that "Interlogix seeks to introduce the testimony of a patent lawyer, Mr. Nixon, to instruct the Court and jury in the area of patent law and to give opinions based on this expertise. Much of Mr. Nixon's proposed expert testimony is little more than parroting patent law concepts in broad, conclusory terms that are ordinarily explained in jury instructions." Chamberlain's Memo at 7–8.

The Federal Rules allow expert testimony when "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and the witness is qualified. Fed. R. Evid. 702. The intricacy of Patent Office practice – particularly in complex "reissue" type proceedings – is a subject for which a jury (and perhaps even this Court) will find it helpful to hear the perspective of an expert such as Mr. Nixon. As his report demonstrates, he will explain what happened in the prosecution history, what particular statements mean in their context, and how the process of obtaining a patent works. Moreover, Mr. Nixon is an experienced patent practitioner and has an advanced degree in electrical engineering; his qualifications are undisputed, and he has testified on similar issues many times in the past in other federal patent proceedings. His combined expertise will enable him to provide the Court and the jury with a technically-based explanation and interpretation of the patents' history.

Interlogix would be significantly prejudiced if Mr. Nixon's report and testimony is stricken. Without an expert such as Mr. Nixon, how will the jury accurately understand what happened in the prosecution of these patents? His testimony will address several issues, including:

- A review of the prosecution history, including the repeated statements made by Chamberlain during the prosecution history that a trier of fact could find amount to a disclaimer of certain subject matter. *See, e.g.*, Nixon Report at 14 (explaining how the interplay of an office action and a response by Chamberlain's prosecution attorney acted to relinquish a claim to a purely software code location pointer); *id.* at 50–51 (observing how Chamberlain attempted to distinguish prior art by stressing that its patent, unlike the prior art, is in the field of garage doors); *id.* at 65 (same); id. at 68–69 (describing the amendments to the patents that were made for purposes of patentability).

- Statements made by Chamberlain that violated the duty of candor or were false and misleading under the circumstances. *See, e.g., id.* at 23 (explaining that the documents attached to various Rule 131 declarations submitted to the PTO do not support various claims in those declarations, a fact that may not have been known to the declarant inventors and was not observed by the patent examiner); *id.* at 39 & n. 5 (noting that one purported "error" identified in a certificate of correction was not an error at all, as revealed by the testimony of the inventors in related litigation); *id.* at 61–62 (noting that Chamberlain had

never informed the PTO of the reason Schindler would not sign an inventor's declaration in support of widening the scope of the patent, and explaining why the PTO did not contend with a related allegation of inequitable conduct); *id.* at 71–73 (summarizing inequitable conduct)

- A real-world view of how the Patent Office works, and why a patent examiner might have failed to undertake sufficient analysis to fully understand the significance of the prior art or the implications of various statements from Chamberlain. *See id.* at 2–6 (observing, inter alia, that a patent examiner might have "20-30 hours total to spend on an application over the course of its entire history at the USPTO").

- A real-world view of how a party like Chamberlain can manipulate the patent process to benefit its interests, including a discussion of the issue of prosecution latches. *See, e.g., id.*, at 67–68 (tying together the prosecution history with outside litigation filed by Chamberlain).

Any fair reading of Mr. Nixon's report demonstrates that his testimony is not, as Chamberlain claims, merely testimony about patent law; it is intended to aid the finder of fact in understanding the history of Chamberlain's patents.

Courts have repeatedly affirmed that such testimony is permissible. For example, the use of expert testimony explaining the prosecution history for purposes of claim construction has been approved by the Federal Circuit. In *EMI Group North America, Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed. Cir. 1998), the Court, after observing that "[t]he expert witnesses discussed the specification and the prosecution history and the meaning of certain rejections, arguments, and amendments during patent prosecution," itself relied upon such testimony, stating: "our determination of the issues on appeal has drawn on . . . the testimony of the expert witnesses, including their conflicting views of the significance of various distinctions drawn during the patent prosecution with respect to the prior art." In *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 274 (Fed. Cir. 1985), the Federal Circuit approvingly discussed the district court's admission and consideration of testimony from a patent expert on topics including prosecution history estoppel and claim differentiation. And in *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1314 (Fed. Cir. 1999), the Court explained that "[t]he process of claim

construction ... will often benefit from expert testimony which may ... help the trial court

understand the patent process itself (complex prosecution histories – not to mention

specifications – are not familiar to most trial courts)."[5]

Courts also have approved expert testimony on the functioning of the Patent Office.  In

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,* 68 F. Supp. 2d 508, 518-20,

525-29 (D.N.J. 1999), the court weighed patent expert testimony from both parties which

provided background on the Patent Office.  The Court extensively quoted the testimony of the

parties' patent experts, including an expert's opinion that "an examiner's ability to discover prior

art for himself is limited by the technological limitations of the Patent Office . . . [t]he examiner

only dedicates 15 to 17 hours to each patent and therefore, relies heavily on the information

provided by the applicant."  *Id.* at 525; *see also Amsted Indus. Inc. v. Buckeye Steel Castings Co.,*

No. 91 C 1179, 1992 WL 372989, at *3-4 (N.D. Ill. Dec. 9, 1992) (allowing extensive patent

expert testimony on PTO procedures).

In addition, expert testimony is regularly permitted on the subject of inequitable conduct.

*See, e.g., Neupak, Inc. v. Ideal Mfg. & Sales Corp.,* No. Civ. 3-96-713 (PAM/JGL), 2001 WL

391775, at *3 (D. Minn. March 19, 2001) (allowing patent expert to testify on claim construction

and inequitable conduct); *Tec Air, Inc. v. Denso Mfg. Michigan, Inc.,* No. 91 C 4488, 1998 WL

395163, at *4-6 (N.D. Ill. July 9, 1998) (considering at length dueling affidavits from patent

---

[5]    Indeed, two of the cases that Chamberlain relies upon for its motion acknowledge the possibility of expert
testimony on issues relating to the prosecution history.  In *Heidelberger Druckmaschinen AG* v. *Ohio
Electronic Engravers,* 2000 U.S. Dist. LEXIS 6581, *13 (N.D. Ill. May 12, 2000), the Court struck testimony
from a patent lawyer that "simply attempts to construe the language [of the patent] as written."  The Court
suggested, however, that "patent lawyer testimony regarding prosecution history" *would* be admissible.
Similarly, in *Heidelberg Harris, Inc.* v. *Mitsubishi Heavy Industries, Ltd.,* 1996 U.S. Dist. LEXIS 258, **7–8,
15–16, 20 (N.D. Ill. Jan. 10, 1996), the Court did preclude a patent lawyer from testifying as to technical issues
because he had *no background in the relevant art* (unlike Mr. Nixon, here).  The Court nonetheless
acknowledged that the same expert's testimony as to claim construction might be admissible where helpful –
for example to explain "terms of art in the prosecution history . . . to help the court come to the correct
meaning of the language employed in the patent."

experts on inequitable conduct); *Cameco Indust., Inc. v. Louisiana Cane Mfg., Inc.*, Civ. A. No.

92-3158, 1995 WL 468234, at *4 (E.D. La. July 27, 1995) (allowing testimony of patent expert

on patent application process, operations and functions of PTO, and materiality of relevant prior

art).[6]

In short, Mr. Nixon's testimony is admissible and should not be stricken. At a minimum,

his entire report and testimony cannot be stricken; and for the reasons stated in the introduction it

would make no sense for the Court to try to parse through the report now (before summary

judgment and before trial) to determine whether certain portions of the report might ultimately

prove to be inadmissible.

## II. THE EXPERT TESTIMONY NOTICED BY INTERLOGIX IS NOT REDUNDANT

The second part of Chamberlain's motion is an unfounded argument that Interlogix's

other experts are "redundant," and that Interlogix should be forced to drop two of its experts on

this basis. This Court should not reach the redundancy argument for the reasons stated in the

introduction and in the footnote below.[7] Furthermore, Interlogix's expert testimony is not

---

[6]  The other cases cited by Chamberlain do not rule out any of the testimony Mr. Nixon intends to proffer. *Endress + Hauser, Inc.* v. *Hawk Measurement Systems Pty. Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997), is typical of Chamberlain's cases. There, the Court – in the context of approving the testimony of a non-lawyer – simply noted that ordinarily patent lawyers may not "[g]ive their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide." It says nothing about testimony intended to guide a finder of fact through the implications of a complex prosecution history. Chamberlain's other cases are similarly limited to purely extrinsic expert testimony on matters of claim construction. *See W.R. Grace & Co.* v. *Vikase Corp.*, 1991 U.S. Dist. LEXIS 14651, **2–3 (N.D. Ill. Oct. 11, 1991); *Utah Medical Products, Inc.* v. *Clinical Innovations Assoc., Inc.*, 79 F.Supp.2d 1290 (D. Utah 1999) (no indication that expert would testify as to the prosecution history); *Vitronics Corp.* v. *Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996) (expert testified on meaning of word to those "skilled in the relevant art, including certain [of plaintiff's] employees," which is extrinsic evidence, rather than the meaning of the word in the "file history").

[7]  The basis for Chamberlain's motion is the Final Pretrial Order appended to this Court's Standing Order Establishing Pretrial Procedure (the "standing order"). *See* Chamberlain's Memo at 5–6. Chamberlain's cases rely on this order, and virtually all are cases deciding pre-trial motions *in limine*. The order only covers testimony at trial: "Only one expert witness on each subject for each party will be permitted to testify absent good cause shown. If more than one expert witness is listed, the subject matter of each expert's testimony shall be specified." Standing Order at n. 7. Not one of the cases cited by Chamberlain strikes the report of a

redundant or cumulative. Instead, each of Interlogix's proposed experts provides different opinions in areas relevant to this case.

### Dr. Frey and Dr. Malik

Chamberlain wrongly claims that Interlogix has identified "two technical experts, Dr. Frey and Dr. Malik," and that the testimony of these experts is redundant because "both . . . intend to testify regarding the 'ordinary skill' in the art and thereafter provide legal conclusions regarding claim construction, infringement, and/or invalidity based upon the same technical background." Chamberlain's Memo at 6–7. This Court need only review the experts' reports to confirm that the two experts deal with separate issues; one with non-infringement and one with invalidity. There is no basis for forcing Interlogix to choose between these two experts; or to force one of them to cover both subjects.

Dr. Jeffrey Frey – a former Professor of Electrical Engineering at Cornell University and now also a patent attorney – will testify on *infringement* issues. *See* Frey Report at 2 (Chamberlain Exhibit 8). He will explain how a person of ordinary skill in the art would understand terms within the patent specification and claim language, and will also explain the various technical reasons why the accused Interlogix products do not meet the claim elements. He also rebuts the testimony of Chamberlain's infringement expert, Dr. Eisenstein. *Id.* at 6, 19. Dr. Frey does reserve the right to provide "background information" on the relevant technology and the prior art if necessary to teach the finder of fact or explain his analysis, but the core of his testimony is on non-infringement. Dr. Frey is obviously qualified as an expert, and not even Chamberlain argues that his subjects are inappropriate for expert testimony.

---

"redundant" expert during discovery; indeed, Interlogix has been unable to find a single case in which the standing order was employed to strike an expert report before trial. Rather, in each of the cited cases the redundant expert was simply barred from testifying at trial.

Dr. Malik, a Professor of Electrical Engineering at Princeton University, will testify on *invalidity* issues. He provides expertise and technical testimony to explain how Chamberlain's patents were anticipated or rendered obvious by specific prior art references. *See* Malik Report at 2–3 (Chamberlain Exhibit 9). He will compare the technical details of the prior art with the invention claimed by Chamberlain in the two patents at issue. *See generally id.*, at 5 *et seq*. Any fair reading of Dr. Malik's report demonstrates that it does not address whether Interlogix's products infringe, but whether the patent is invalidated by the prior art.

The testimony of these two experts is thus plainly not redundant. Any possible overlap in the testimony of the witnesses can be dealt with during the trial, or may even be avoided altogether as a result of the claim construction/summary judgment process.

### Dr. Hausman and Mr. Kuyk

Chamberlain also seeks to strike one report from what it calls Interlogix'ss "two damage experts, Dr. Hausman and Mr. Kuyk." Chamberlain's Memo at 7–8. As with Chamberlain's objection to the "technical experts," its claim that one of the "two damage experts" should be stricken now as redundant is wrong.

Interlogix's expert Mr. Charles Kuyk is an expert accountant. *See* Chamberlain Exhibit 11 (Kuyk Report). After Mr. Kuyk provides background information about Interlogix, its market and its sales history, the bulk of Mr. Kuyk's report consists of a critique and rebuttal of the arguments presented in the report of Chamberlain's damages expert, Mr. McGavock, who is also an accountant. Mr. Kuyk's report points out a number of flaws in Chamberlain's analysis. Because Chamberlain's Mr. McGavock uses a particular legal framework -- the *Georgia-Pacific* analysis -- to reach an opinion of a reasonable royalty, Mr. Kuyk's critique follows that same structure. Mr. Kuyk ultimately declares what a reasonable royalty should have been in the

context of showing the flaws in the McGavock report's arrival at a much higher figure. *See id.* at 21–28.

Interlogix'ss expert Dr. Hausman, an *economist* and a Professor of Economics at MIT, provides a related, but different, report. *See* Chamberlain Exhibit 10. Dr. Hausman's report does not critique Chamberlain's expert report. Rather, he will testify about the economics of a hypothetical licensing negotiation between the parties and how it would result in a royalty rate. His ultimate opinion about an appropriate reasonable royalty rate differs from Mr. Kuyk's.

In the context of this case, Interlogix submits that a jury will find it helpful to take into account the different expertise and opinions of an economist and an accountant in determining what, if any, damages are appropriate. The security products of Interlogix do not compete against Chamberlain's garage door products, and because the markets are different it is important for the jury to hear an economist explain the factors that would drive a hypothetical negotiation between two companies that do not compete. It is also helpful for a jury to hear from Interlogix's expert accountant as to why the opinion of Chamberlain's accountant is flawed and incorrect, and to explain the correct analysis for obtaining a reasonable royalty figure. Accordingly, the testimony of these experts is permissible even under the standing pretrial order, as their testimony is different in scope and there is "good cause" for some overlap of these witnesses. *See, e.g., THK America, Inc.* v. *NSK, Ltd.,* 917 F.Supp. 563, 576 (N.D. Ill. 1996) ("[w]here the testimony of one witness merely overlaps the testimony of another, this Court deems it unnecessary to bar one of them"); *Robinson* v. *Thomas,* 1995 WL 608525, **5–6 (N.D. Ill. Oct. 11, 1995) (permitting two experts on the same subject where one "supplement[s]" the other).

Respectfully submitted,

GOODWIN PROCTER LLP

By: _John C. Englander_ /gc

     John C. Englander
     J. Anthony Downs
     Goodwin Procter LLP
     Exchange Place, 17th Floor
     Boston, Massachusetts 02109
     (617) 570-1000

MAYER, BROWN, ROWE & MAW

By: _Vincent J. Connelly_

     Sheila Finnegan
     Vincent J. Connelly
     Mayer, Brown, Rowe & Maw
     190 South LaSalle Street
     Chicago, Illinois 60603
     (312) 782-0600

     Counsel for Defendant/Counterclaim-
     Plaintiff Interlogix, Inc.

Dated: April 2, 2002

## CERTIFICATE OF SERVICE

I, Vincent J. Connelly, an attorney, hereby certify that I caused to be served copies of the foregoing **INTERLOGIX'SS OPPOSITION TO CHAMBERLAIN'S MOTION TO STRIKE EXPERT REPORTS AND EXCLUDE EXPERT TESTIMONY** upon the following, by the following means:

**By facsimile and by hand-delivery (messenger)**
John F. Flannery, Esq.
Karl R. Fink, Esq.
Rudy I. Kratz, Esq.
FITCH, EVEN, TABIN & FLANNERY
120 South LaSalle Street
Suite 1600
Chicago, Illinois 60603

on April 2, 2002.

Vincent J. Connelly

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

AMSTED INDUSTRIES INCORPORATED, Plaintiff,
v.
BUCKEYE STEEL CASTINGS COMPANY, Defendant.

No. 91 C 1179.

Dec. 9, 1992.

MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

**\*1** Plaintiff Amsted Industries Incorporated ("Amsted") sues defendant Buckeye Steel Castings Company ("Buckeye") for infringement of United States Patent No. 3,664,269 ("the '269 patent"). The '269 patent, which relates to the underframe of a railway car, has five elements. Buckeye sells only one of those elements--a center plate--to customers who assemble that element, along with the remaining elements, into a combination that allegedly infringes the '269 patent. Buckeye counterclaims that Amsted's RoadMaster truck infringes Buckeye's patent, United States Patent No. 3,638,582 ("the '582 patent"). Before the court are various pre-trial motions, including a motion to strike trial exhibits, a motion regarding jury instructions and several motions *in limine*.

*DISCUSSION*

A motion *in limine* excludes clearly inadmissible evidence that may prejudice or confuse a jury. Evidence should not be excluded *in limine* unless it is clearly inadmissible on all potential grounds. Evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. *See General Electric Capital Corp. v. Munson Marine, Inc.*, No. 91 C 5090, 1992 WL 166963, at \*1, 1992 U.S.Dist. LEXIS 10331, at \*3 (N.D.Ill. July 7, 1992). *See generally* 21 Charles A. Wright, Kenneth W. Graham, Jr., *Federal Practice and Procedure* §§ 5037, 5042 (1977). The denial of a motion *in limine* does not mean that all evidence contemplated by the motion will be admitted at trial.

Denial merely means that without the context of trial, the court is unable to determine whether all evidence of the contemplated type should be excluded. The court will entertain objections on individual proffers as they arise even though the proffer would have been within the scope of a denied motion *in limine*.

*BUCKEYE'S MOTIONS*

I. *The Patent Marking Statute*

In its motion "To Exclude Evidence Pertaining to Amsted's Damages Prior To January 31, 1989," Buckeye imaginatively repackages a legal theory at the heart of two of its previously denied summary judgment motions. The court never considered the legal arguments regarding patent marking presented in those motions on their merits. But the court's inability to reach this issue was not precisely "procedural" either. *But see* Buckeye's Brief Further Comments on the Marking Issue at 2. Buckeye's original motion ultimately relied on a fact--whether Amsted's customers had marked the resulting combination--that Buckeye had failed to show was undisputed, all in violation of Fed.R.Civ.P. 56 and Local Rule 12(m). Thus, the motion was denied. The court thereafter refused to reconsider the motion on procedural grounds, noting the flurry of papers Buckeye had already filed in this matter. *See also Amsted Indust. Inc. v. Buckeye Steel Castings Co.*, No. 91 C 1179, Min.Ord. (N.D.Ill. issued June 3, 1992) (Rovner, J.) (setting June 12, 1992 as last date to seek leave to move for summary judgment).

**\*2** Resolution of the issue now on a motion *in limine* would be improper. Motions *in limine* are not suited to determining undisputed facts and applying the law to those facts. The parties have not submitted statements of undisputed facts, and the court has no authority to determine whether there are disputed facts on a motion *in limine*. Though the court must decide what the law is for the purpose of instructing the jury (*see infra* ), the jury will find the facts and apply the law. To be sure, the outcome of a summary judgment motion on this issue had the potential to reduce the parties' (and the court's) time and expense in resolving this case. Unfortunately, the briefing on the issue was inadequate to resolve the issue.

Evidence of damages prior to January 31, 1989 [FN1] is conclusively inadmissible only if there was a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1992 WL 372989
(Cite as: 1992 WL 372989, *2 (N.D.Ill.))

Page 2

duty to mark, the marking was inadequate, and the notice given before that time was inadequate. As these are jury issues, the motion is denied.

II. *Accelerated Reentry Damages*

Buckeye already argued and lost the issue raised by this motion. Buckeye moves to exclude "Evidence of Buckeye's Sales Made After The Expiration" of the '269 patent. The court denied Buckeye's motion for partial summary judgment, based on the invalidity of the accelerated reentry theory of damages, on the ground that Judge Rovner had already decided the issue against Buckeye's position. *See Amsted*, No. 91 C 1179, Min.Ord. (N.D.Ill. issued Sept. 10, 1992). This motion is denied on the same ground. *See Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir.1987) (court is bound to follow prior decisions in same case absent supervening development).

III. *Patent Not in Suit*

Buckeye seeks to exclude evidence regarding U.S. Patent No. 4,674,412 ("the '412 patent"). The '412 patent itself is not at issue in this suit. The '412 patent covers improvements made to Buckeye's '582 patent that are embodied in Amsted's RoadMaster Truck. While the existence, history and prosecution of another patent are not a defense to infringement, these considerations may be relevant on the issues of equivalence and damages. *Atlas Powder Co. v. E.I. DuPont de Nemours*, 750 F.2d 1569, 1580 n. 3 (Fed.Cir.1984). The motion to exclude all evidence regarding the '412 patent is denied.

IV. *The National Castings Case*

Buckeye moves to exclude all evidence regarding *Amsted Industries, Inc. v. National Castings, Inc.*, No. 88 C 0924 (N.D.Ill.1988), in which Amsted sued another defendant on the same patent and obtained a judgment. Buckeye contends that evidence regarding the prior case has no relevance to this one. However, a prior determination of validity--as there was in *National Castings*--may be admissible. *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 723 (Fed.Cir.1990). The motion to bar all evidence regarding the *National Castings* case is denied.

V. *Prejudicial Exhibits*

*3 Buckeye seeks to exclude all evidence of and

references to approximately a dozen documents consisting of pleadings, discovery responses and letters between counsel. Buckeye asserts that Judge Rovner excluded some of these documents in the *National Castings* case. But that was because the documents went to the issue of exceptional circumstances, which Judge Rovner determined was an issue for the court. Buckeye fails to identify any specific reasons for excluding these documents. There is nothing inherently prejudicial in a court pleading, nor is it automatically admissible. As Amsted points out, some of these documents may be relevant as admissions or on the issues of willfulness or bad faith. The motion is denied.

*AMSTED'S MOTIONS*

I. *Robert Benson*

Amsted seeks to completely exclude the testimony of Robert Benson. Benson is a patent attorney with extensive experience in the heavy equipment industry. PTO Ex. E2. [FN2] Buckeye offers Benson's testimony about patent office procedures, patent counsel opinions during the relevant period, patent licensing practices during the relevant period, and infringement notice practices during the relevant period. *Id.* Amsted claims Benson will impermissibly testify to matters of patent law.

Excluding all the testimony of a witness--rather than of a certain subject matter--is an extraordinary measure. It is not clear from the record here that it is warranted. True enough, when a question of fact depends on a subsidiary question of federal law and the court is trier of fact, no expert is required because federal judges are experts in federal law. *See W.R. Grace & Co. v. Viskase Corp.*, No. 90 C 5383, 1991 WL 211647, 1991 U.S.Dist. LEXIS 14651 (N.D.Ill. issued Oct. 11, 1991). But here a jury will be called on to make various factual determinations, some turning on the custom and practice of patent lawyers. Because none of these questions will themselves be the subject of court instructions, they may properly be a subject of expert testimony by a patent lawyer. *Amsted Industries Inc. v. National Castings Inc.*, 16 U.S.P.Q.2d 1737, 1759-61 (N.D.Ill.1990).

For example, Benson will testify as to the custom and practice of negotiating reasonable royalties for the relevant time period. The Federal Circuit has approved the use of a patent attorney to testify as an expert, to assist the trier of fact in the reasonable

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

royalty determination. *See, e.g., Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079-80 (Fed.Cir.1983). Buckeye will also offer Benson's testimony about the competency of Buckeye's patent counsel's opinion regarding the '269 patent. Willful infringement is an issue in this case, and reliance on the competent opinion of counsel is one factor that may negate a finding of willfulness. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986). The finder of fact may properly consider whether an opinion obtained was in fact competent. *See, e.g., Studiengesellschaft Kohle v. Dart Indust. Inc.*, 862 F.2d 1564, 1574-75 (Fed.Cir.1988). Assuming a foundation is laid under Fed.R.Evid. 702, Benson's testimony about the competence of the patent opinion (including, for example, an assessment of the qualifications of counsel and whether or not counsel considered all the relevant factors) is potentially admissible. Benson's proffered testimony also includes an explanation of the significance and practice of establishing and terminating escrow accounts. Testimony about these technical factual matters may assist the jury. Fed.R.Evid. 702; *National Castings, supra.*

*\*4* Amsted correctly points out that some of Benson's proffered testimony comes dangerously close to rendering legal conclusions. Benson will not be allowed to testify to legal conclusions, such as what constitutes notice of infringement. Nor will Benson be permitted to opine on the ultimate accuracy of patent counsel's opinion because that would intrude on the jury's function.

Moreover, some of Benson's proffered testimony may suffer from an additional infirmity: its relevance is not readily apparent. For example, Buckeye fails to make clear the relevance of the inner workings of the Patent Office. Whether Benson will be permitted to testify to this and other matters at trial depends on a further showing of relevance.

Amsted also suggests that Benson is not qualified because he only has "heavy equipment industry" experience, not railroad industry experience. It is not self-evident that Benson is unqualified to give expert testimony on this basis. The industries may be similar enough—and the patent law customs common enough—for his testimony to be helpful to the jury. *See* Fed.R.Evid. 702. The motion is denied.

**II.** *William Buffington*

Amsted apparently seeks to sanction Buckeye for suspending a deposition with Buckeye's Senior Vice President William Buffington, by excluding his testimony at trial. But Amsted does not indicate the legal basis for its motion and it does not specify exactly how it was prejudiced by the suspension of the deposition. During the deposition, Amsted primarily sought an assurance that Buckeye would only call Buffington for testimony about the warranty reserve issue. Amsted now has that assurance. *See* Buckeye Resp. at 2 ("Buckeye has long stated that the trial testimony of Mr. Buffington would be confined to the facts surrounding the institution of the escrow account for patent defense contingencies" and its termination). The motion is denied.

### MARKING ISSUE JURY INSTRUCTIONS

This is the fourth time the marking statute issue has been briefed. Amsted will not offer evidence regarding marking to the jury, thus the sole issue is that of notice of infringement. After considering the proposed instructions submitted by the parties, the court will charge the jury regarding notice as provided in the Appendix. In formulating the instruction, the court was mindful that the primary purpose of the marking statute is to provide public notice. *See Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387, 395-98 (1936). And while knowledge or awareness is generally considered insufficient to constitute notice, [FN3] the venerable precedent relied on by Buckeye seems to have given way to a more sensible and flexible concept of notice. *See, e.g., T.D. Williamson, Inc. v. Laymon*, 723 F.Supp. 587, 606 (N.D.Okla.1989), *aff'd without comment*, 923 F.2d 871 (Fed.Cir.1990), *cert. dismissed*, 500 U.S. 901, 111 S.Ct. 1646 (1991). Thus, the court rejects Buckeye's contentions that notice is ineffective until after a defendant has begun infringing, and that notice must be given by the patentee and cannot be given by its agents or predecessors. These limitations simply do not square with the rationale and modern interpretation of Section 287.

### CONCLUSION

All motions *in limine* are denied. Defendant's motion to strike "prejudicial" trial exhibits is denied. The court will instruct the jury regarding notice as provided in the Appendix.

*APPENDIX*
*Jury Instructions Regarding Patent Marking Statute*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*5 A plaintiff may only recover damages from a defendant for infringement that occurred after the defendant had notice that it was infringing the plaintiff's patent.

If you find that Buckeye infringed Amsted's patent, then you must also determine when Buckeye was given notice of the infringement.

Amsted gave Buckeye actual notice of infringement when Amsted notified Buckeye that Amsted owned the '269 patent and that Buckeye's practice or device infringed the patent.

Amsted may have given effective notice of infringement even if Buckeye had not yet infringed the '269 patent but Buckeye planned to do so.

Notice of infringement is more than awareness or knowledge of infringement. Buckeye is only liable for any infringement that occurred after Amsted gave Buckeye actual notice of infringement. Buckeye is not liable just because it knew Amsted held the '269 patent or even that Buckeye was infringing the '269 patent.

Buckeye had notice of infringement so long as it received notice from Amsted, one of Amsted's agents, or Amsted's predecessor in interest in the '269 patent.

Notice of infringement may be oral or in writing.

FN1. The parties agree that the notice given on this date was legally sufficient.

FN2. "PTO" refers to the joint final pretrial order.

FN3. *See generally* 5 Donald S. Chisum, *Patents* § 20.03[7][c][4] (1992). *But compare International Nickel Co. v. Ford Motor Co.*, 166 F.Supp. 551, 567 (S.D.N.Y.1958) *with Livesay Window Co. v. Livesay Indus., Inc.*, 251 F.2d 469 (5th Cir.1958).

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

United States District Court,
D. Minnesota.

NEUPAK, INC., Plaintiff,
v.
IDEAL MANUFACTURING AND SALES CORP.,
Defendants.

No. CIV.3-96-713(PAM/JGL).

March 19, 2001.

Parties to patent infringement suit filed various motions in limine regarding admissibility of evidence. The District Court, Magnuson, J., held that: (1) uncorroborated testimony of expert for alleged infringer regarding prior art references was inadmissible; but (2) expert could testify regarding commercial success of patentee's product, and claimed inequitable conduct; (3) second expert for alleged infringer could testify that patentee's device would be obvious to a person of ordinary skill in the field; (4) patentee waived attorney-client privilege with respect to documents it voluntarily produced; (5) failure of alleged infringer to disclose item of evidence until last day of discovery did not warrant its exclusion; and (6) patent attorney could testify as expert for patentee.

Motions granted in part and denied in part.

West Headnotes

[1] Patents ☜112.5
291k112.5

The law looks with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony.

[2] Patents ☜62(2)
291k62(2)

Testimony of expert witness for alleged patent infringer regarding eight prior art references he remembered seeing during previous 20 years, but for which he had no corroborating documents or other corroborating information, was inadmissible in infringement suit.

[3] Patents ☜59
291k59

Testimony of expert witness for alleged patent infringer regarding prior art patents was admissible in infringement suit, even though prior patents were before Patent and Trademark Office (PTO) during reexamination proceedings for patent at issue in suit; fact that PTO considered prior patents, but still issued disputed patent, went to weight to be accorded to prior art patents, not their admissibility.

[4] Patents ☜36(1)
291k36(1)

Testimony of expert witness for alleged patent infringer regarding commercial success of patentee's product, and claimed inequitable conduct by patentee, was admissible in patent infringement suit, which was being tried to the court; in event expert offered testimony on an issue that was for the court to determine, court could discount that testimony.

[5] Patents ☜36(1)
291k36(1)

Testimony of expert witness for alleged patent infringer that, given similarities between patentee's device and other machines, patentee's device would be obvious to a person of ordinary skill in the field, was admissible in a patent infringement suit, even though machines with which expert was familiar were allegedly different from device covered by patent in important respects; issue of expert's familiarity with patented device went to weight to be accorded his testimony, not to its admissibility.

[6] Patents ☜36(1)
291k36(1)

Qualifications, or lack thereof, of expert witness testifying on behalf of alleged infringer in patent infringement suit, bore only on the weight to be accorded to his testimony, and did not require exclusion.

[7] Witnesses ☜219(3)
410k219(3)

Patentee waived attorney-client privilege with respect to documents when it voluntarily produced them because it believed that they were not privileged due to "conduit" theory, even though patentee alleged that "conduit" theory had since been overruled; theory was not widely accepted prior to ruling to which patentee pointed, and patentee did not object to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

168 F.Supp.2d 1012
**(Cite as: 168 F.Supp.2d 1012, 2001 WL 391775 (D.Minn.))**

questioning of a witness regarding documents months after ruling was issued.

[8] Federal Civil Procedure ☞1278
170Ak1278

Factors considered in determining whether a failure to disclose evidence had substantial justification or was harmless, and thus does not require exclusion of evidence, include (1) the importance of the excluded material, (2) the explanation of the party for the failure to comply with the disclosure rules, (3) the potential prejudice from allowing the material to be used at trial, and (4) the availability of a continuance to cure such prejudice. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

[9] Patents ☞292.3(2)
291k292.3(2)

Failure of alleged patent infringer to disclose program book from industry group annual meeting until last day of discovery period did not require exclusion of program book from evidence in patent infringement suit; while program book clearly should have been disclosed earlier, neither prejudice nor a nefarious motive was shown. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

[10] Evidence ☞506
157k506

Patent attorney would be permitted to testify as expert witness on behalf of patentee in infringement suit; however, court would caution parties that expert testimony should concern only the disputed factual elements of case, as legal issues had been fully briefed and were within province of court to determine.

*1014 Joanne Horwood Turner, Mackall, Crounse & Moore, Minneapolis, MN, John B. Lunseth, II, Gerald Eugene Helget, Nelson R. Capes, Michael M. Lafeber, Rider, Bennett, Egan & Arundel, Minneapolis, MN, for Plaintiff.

Robert Lester Bach, Felhaber, Larson, Fenlon & Vogt, Minneapolis, MN, Joseph A. Ranney, DeWitt, Ross & Stevens, Madison, WI, for Defendant.

MEMORANDUM AND ORDER

MAGNUSON, District Judge.

**1 This matter is before the Court on four Motions in Limine filed by Plaintiff Neupak, Inc. ("Neupak"), and one Motion in Limine filed by Defendant Ideal Manufacturing and Sales Corporation ("Ideal"). The case is set for a bench trial before the undersigned on March 26, 2001. For the following reasons, the Motions in Limine are denied in part and granted in part.

DISCUSSION

**I.** *Plaintiff's Motions*

**A. Motion to Exclude Defendant's Expert Witnesses**

Neupak seeks to exclude the testimony of all three of Ideal's expert witnesses: Robert Reeves, Rodney Laube, and Charles Hayes.

**1.** *Robert Reeves*

Neupak challenges Reeves' testimony on several grounds. First, Neupak contends that Reeves should not be allowed to testify as to eight alleged prior art references for which he has no corroborating documents or other corroborating information. Ideal responds that other witnesses will corroborate Reeves' testimony, but as Neupak points out, the testimony of these witnesses concerns machines other than the eight for which Reeves has no brochures or specifications.

[1][2] The Federal Circuit has noted that "[t]he law has long looked with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony." *Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1366 (Fed.Cir.1999). Reeves' testimony with respect to the eight machines he remembers seeing at various points in the past twenty years is not corroborated by any documents or by any other testimony. This portion of his testimony is therefore excluded.

[3] Neupak also contends that Reeves' testimony with regard to prior patents as potentially invalidating prior art should be excluded because all of the prior patents were before the Patent and Trademark Office ("PTO") during the reexamination proceedings. Ideal responds that these patents are relevant because, in combination with the 1992 machine that was not disclosed to the PTO, they render obvious *1015 all of the claims of the disputed patent. Neupak cites no authority for the proposition that, merely because a

168 F.Supp.2d 1012

Page 7

**(Cite as: 168 F.Supp.2d 1012, \*1015, 2001 WL 391775, \*\*1 (D.Minn.))**

prior patent was considered by the PTO in its patent process, it may not be raised in a proceeding to invalidate the later patent. The fact that the PTO considered these prior patents and still issued the disputed patent goes to the weight to be accorded the prior patents and not to their admissibility. This portion of the motion is denied.

[4] Next, Neupak contends that Reeves should not be allowed to testify as to the commercial success of Neupak's filling machine, or as to inequitable conduct. Ideal asserts that Reeves is competent to testify as to the factors that affect the commercial success of machines in this industry. Ideal also argues that Reeves will not offer his opinion on the ultimate issue of inequitable conduct, but will testify only as to whether prior art references were material for the purposes of the inequitable conduct inquiry. Neupak responds to this argument by saying that materiality is a question of law reserved for the Court to determine. This matter will be tried to the Court. Therefore, should Reeves offer testimony on an issue that is reserved for the Court to determine, the Court can discount that testimony. These portions of the motion are denied.

### 2. *Rodney Laube*

\*\*2 [5] Neupak contends that Laube's testimony is irrelevant because the machines with which he is familiar, the Mateer-Burt machines, are different from the disputed patent in important respects. According to Ideal, Laube is competent to testify that, given the similarities between several of the Mateer-Burt machines and Neupak's patented machine, Neupak's machine would be obvious to a person of ordinary skill in the field. Moreover, although the PTO considered the Mateer-Burt machines, Ideal claims that Neupak misrepresented the features of these machines, and that the Mateer-Burt machines do, in fact, contain the same features as those in Neupak's patented machine. Neupak's disagreement with Laube's testimony goes toward the weight Neupak believes should be accorded that testimony, and not to its admissibility. Laube's testimony will be allowed, and this portion of Neupak's motion is denied.

### 3. *Charles Hayes*

[6] Neupak contends that Hayes is not an expert in the field of liquid filling machines. However, Hayes' qualifications, or lack thereof, bear only on the weight the Court will accord his testimony. Hayes's

testimony will be allowed, and this portion of Neupak's motion is denied.

### B. Motion to Exclude Ideal's § 282 Disclosures

Neupak asks the Court to exclude evidence of "hundreds" of patents that Ideal claims are relevant for determining whether Neupak's patent is valid. According to Neupak, Ideal has failed to explain how the patents are relevant, either individually or in combination. Ideal responds that it has disclosed its intent to rely on these patents to Neupak, and that it is not obligated to tell Neupak how the patents are relevant. Ideal contends that it will present the evidence in a concise manner at trial, and will not waste the Court's time.

If Ideal's presentation of the evidence threatens to waste the Court's time, the Court can limit the presentation at that time. The Court cautions both parties that the Court expects the trial to proceed expeditiously and expects that counsel will not present evidence in a way that wastes anyone's time. Neupak's motion is denied.

### \*1016 C. Motion to Exclude Privileged Documents

Neupak seeks to exclude certain documents it contends are subject to the attorney-client privilege. The Court has previously refused to compel Neupak's attorney to testify regarding these documents. However, the documents at issue will not be excluded.

[7] Neupak voluntarily produced the documents because it believed that the documents were not privileged pursuant to the "conduit" theory. According to Neupak, that theory has since been overruled by the Federal Circuit. *In re Spalding,* 203 F.3d 800, 806 n. 3 (Fed.Cir.2000). However, as Ideal points out, the conduit theory was not widely accepted prior to the Federal Circuit's ruling, and in any case, Neupak did not object to Ideal's questioning a witness about the documents months after the *Spalding* case was issued.

Neupak waived the privilege with respect to the documents at issue. Ideal will be allowed to introduce the documents into evidence.

### D. Motion to Exclude Program Book

\*\*3 Finally, Neupak seeks to exclude from evidence the Program Book from the Federation of Societies

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

168 F.Supp.2d 1012
(Cite as: 168 F.Supp.2d 1012, *1016, 2001 WL 391775, **3 (D.Minn.))

for Coatings Technology's 1992 Annual Meeting and Paint Industries Show. The Program Book was not disclosed to Neupak by Ideal until the last day of the discovery period, February 1, 2001. Ideal admits that it has had the Program Book since 1998, but claims that it inadvertently failed to disclose it.

[8] Neupak argues that the Program Book should be excluded under Fed.R.Civ.P. 37(c)(1). Rule 37 states that a party shall not use at trial information it failed to disclose, unless the party had substantial justification for the failure to disclose, and unless such failure is harmless. The Eighth Circuit has set forth a four factors that the Court should consider in determining whether a failure to disclose had substantial justification or was harmless: (1) the importance of the excluded material; (2) the explanation of the party for the failure to comply with the disclosure rules; (3) the potential prejudice from allowing the material to be used at trial; and (4) the availability of a continuance to cure such prejudice. *Citizens Bank v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir.1994).

[9] Neupak claims that it will be substantially prejudiced if the Program Book is not excluded because the late disclosure has made discovery regarding the Program Book impossible. This may be true; however, Neupak does not specify what discovery it needs to conduct regarding the Program Book.

Neupak also implies that Ideal had a nefarious motive in failing to disclose the Program Book. Neupak has no evidence of such motive, however, and Ideal has explained that its failure to disclose was inadvertent. It is clear that Ideal should have disclosed the Program Book earlier. However, exclusion of that evidence is more draconian than the situation calls for. The Program Book will be allowed.

## II. *Defendant's Motion*

### A. Motion to Exclude Plaintiff's Expert

[10] Ideal asks the Court to exclude the testimony of one of Neupak's expert witnesses, J. Michael Thesz, a patent attorney. Ideal objects to his testimony because Ideal contends that the testimony consists of improper legal conclusions, and that Thesz is attempting to usurp the Court's role to construe the claims of the patent and to determine whether inequitable conduct occurred.

*1017 The Court cautions the parties that expert witness testimony should concern the disputed factual elements in this case. The parties have fully briefed the legal issues, and those issues are now the Court's province to determine. The Court will allow Thesz to testify.

## CONCLUSION

For the foregoing reasons, and upon all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Plaintiff's Motions in Limine (Clerk Doc. No. 115) are DENIED IN PART and GRANTED IN PART as set forth above; and
2. Defendant's Motion in Limine (Clerk Doc. No. 111) is DENIED.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1998 WL 395163
49 U.S.P.Q.2d 1944
(Cite as: 1998 WL 395163 (N.D.Ill.))
**H**

United States District Court, N.D. Illinois.

TEC AIR, INC, Plaintiff,
v.
DENSO MANUFACTURING MICHIGAN, INC.,
and Denso Corporation Defendants.

No. 91 C 4488.

July 9, 1998.

*MEMORANDUM AND ORDER*

MANNING, J.

**\*1** This matter is before the court on defendants'
claims seeking a finding of inequitable conduct by the
plaintiff, hence barring enforceability. The court
finds no inequitable conduct and Judgment is entered
in favor of plaintiff.

Background

Plaintiff Tec Air brought this patent infringement
action pursuant to 28 U.S.C. § 1338, alleging that
defendants Denso Manufacturing Michigan, Inc. and
Denso Corporation [FN1] infringed upon Tec Air's
patents. Tec Air is the assignee of United States
Patent Nos. 4,047,692 ('692 patent) and 4,107,257
('257 patent), commonly referred to as the Swin
patents.

> FN1. Defendants Denso Corporation and Denso
> Manufacturing Michigan, Inc. are collectively
> referred to herein as Nippondenso.

This action was trifurcated, requiring separate trials
as to: 1) infringement; 2) invalidity and
unenforceability, and; 3) damages. The jury found
Nippondenso liable for infringing upon both of the
Swin patents.

The invalidity and unenforceability issues were tried
by a jury which returned a verdict in favor of Tec Air
in all respects. The unenforceability issues, though
tried with invalidity, were severed and submitted to
the court since Nippondenso raised an inequitable
conduct defense against Tec Air. Nippondenso
alleges that Tec Air, in applying for the Swin patents,
intentionally misled the Patent and Trademark Office
(PTO) by failing to disclose a prior art which utilizes
brass plugs for balancing fans.

In response, Tec Air asserts that it fully disclosed all
material prior art related to the Swin patents, in a
manner consistent with its duties to the PTO, and that
Nippondenso has failed to prove Tec Air intentionally
misled or failed to disclose material information
related to the Swin patents.

Having: (1) considered the testimonial and other
evidence presented; (2) assessed the credibility of the
witnesses; (3) perused the submissions of the parties;
and (4) reflected on the legal arguments of counsel,
the court enters judgment in favor of Tec Air. These
Findings of Fact and Conclusions of Law are
intended to formalize this court's decision and to
provide full details explaining the basis of the
judgment reached by this court as to Nippondenso's
patent unenforceability arguments.

To the extent, if any, that the findings as stated may
be deemed conclusions of law, they shall also be
considered conclusions. In the same way, to the
extent, if any, that matters later expressed as
conclusions of law may be deemed findings of fact,
they shall also be considered findings. In both those
respects, *see Miller v. Fenton*, 474 U.S. 104,
113-114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

Findings of Fact

1. Plaintiff Tec Air is a corporation organized and
existing under the laws of the State of Illinois and has
offices in Willow Springs, Illinois. Tec Air was
founded by Richard Swin, Sr. along with his wife
and family. Currently, his son Rick Swin, Jr. is the
president of Tec Air.

2. Defendant Denso Manufacturing, Inc. is a
corporation organized under the laws of the State of
Michigan having offices at One Denso Road, Battle
Creek, Michigan.

**\*2** 3. Defendant Denso Corporation is a corporation
organized under the laws of Japan having offices at
1-1 Showa-cho, Kariya-shi, Aichi-ken, 448 Japan.

4. Jurisdiction is proper pursuant to 28 U.S.C. §
1338, and is not disputed. Venue is proper pursuant
to 28 U.S.C. §§ 1391 and 1400(b), and is not
disputed.

5. Tec Air is the assignee of the '692 patent issued

to Swin, Sr. on September 13, 1977 entitled "Apparatus For Molding Dynamically Balanced Fans."

6. Tec Air is the assignee of the '257 patent issued to Swin, Sr. on August 15, 1978, entitled "Method For Molding Dynamically Balanced Fans." The '692 and '257 patents are commonly referred to as the "Swin patents."

7. The '692 patent was filed with the PTO on September 24, 1975, while the '257 was filed on April 22, 1977. Both have an effective filing date of September 24, 1975.

8. The Swin patents generally relate to the method of manufacture of plastic air movement devices, i.e., fans and blower wheels. The devices are commonly used in manufactured goods including, appliances, heating systems, and automobiles.

9. Seeking to profit in the machine motor market, Swin opened Tec Air. Initially, Tec Air purchased its plastic fan blades from a company named Grish, which manufactured plastic propellers for model airplanes. However, due to persistent problems with fan imbalance, Tec Air's primary customer, NuTone Corp., insisted that Tec Air begin to manufacture its fans in-house.

10. The plastic fan blade manufacturing process utilizes injection-molding machines which have three basic elements: (1) an oven which heats plastic pellets passed from a hopper; (2) a mold which receives the molten plastic after it has been heated by the oven, and; (3) a clamping mechanism which holds the mold tightly closed until the plastic part is ejected.

11. Typically, the molds have two halves which form the plastic into the desired shape. Sometimes the molds use interchangeable inserts which are located at the center or hub of the mold.

12. Fan blades require precision crafting in order to ensure proper balance. Unbalanced fan blades cause motors to malfunction. Therefore, any technology which would ensure proper balance would be a valuable invention.

13. At the time Tec Air began manufacturing its own fans, there were three manufacturing methods available to ensure fan balance: (1) "machining"; (2) "brass plugs," and; (3) the Gelbard patent method. All three methods are prior art against the Swin

patents.

14. Swin, Jr. testified that once Tec Air began manufacturing its own fan blades, it tried alternative methods of curing fan imbalance, including "machining," "taping," and using brass plugs, but found them all to be unsatisfactory.

15. Denso has accused Tec Air of inequitable conduct, claiming that Tec Air intentionally withheld information about the brass plug method of fan balance. Denso contends that the brass plug method combined with the Gelbard patent method teaches persons with ordinary skill in the injection molding art how to create the inventions claimed in the Swin patent.

*3 16. After reviewing the testimony, the court is convinced that Tec Air did not engage in inequitable conduct. First, the brass plug method is not material to the Swin patent because it does not teach the method of fan balance claimed in the Swin patents. Second, even assuming that the brass plug method is material, Swin adequately disclosed its existence since the brass plug method is a variation of machining which Tec Air disclosed to the PTO during the Swin patent prosecution. Thus, the PTO examiner had sufficient information to determine whether the prior art teaches the method claimed in the Swin patents.

17. Machining is the traditional method of balancing fan blades made by injection machines. It involves having skilled technicians remove metal from the mold to achieve the desired shape and balance. The process has several disadvantages, including:

a. it slows production because if fan imbalance persists, the imprecise molds must be replaced with new molds which require additional machining, thereby delaying production;

b. often molds are removed from the injection machinery in order to reach the surface of the mold to machine which is time consuming and dangerous because the molds are incredibly heavy and can be removed only with the assistance of a crane;

c. assuming that the mold is not removed from the injection equipment, the technician must reach inside the equipment while machining the metal from the mold. This is dangerous because the molds are incredibly heavy and could injure someone in case of an accident.

d. machining often leaves loose metal bits on the surface which can detach when the mold halves are pressed together and fall into the plastic thereby

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

ruining the plastic mold.

18. The brass plug approach is a variation of machining in which holes are drilled into the metal of the mold and brass plugs (metal rods) are inserted into the holes. Rather than machining metal from the face of the mold, metal is machined from the brass plug. The brass plugs are softer than the steel molds thereby making machining of the mold easier.

19. Brass plugs pose similar metal contamination and imbalance problems like machining. Moreover, due to the thermal expansion in metal when heated, the brass plug could loosen from the mold and damage the mold.

20. The Gelbard method, so named after the patents assigned to Robert Gelbard of General Electric Company, was an improvement on machining. The Gelbard patent claimed to disclose a "completely different process from the machining methods" which entails hollowing out peripheral portions of the fan mold to create pads near the tips of the fan blades made from the mold. Gelbard then inserts screws that could be moved into the hollowed-out portions to subtract a selected amount of plastic from the pads to achieve balance. The screws are turned to achieve proper balance.

21. The Gelbard patent is problematic because the pads it utilizes interfere with air flow and can only be adjusted from the back of the mold which made it difficult to turn the screws to adjust fan balance.

*4 22. Unlike brass plugs or the Gelbard method, the Swin patents use adjustable plugs which are movable within threaded recesses located in either the mold, or an insert in the center or hub area of the mold. The adjustable plugs are accessible from the front or cavity-side of the mold, not just the back of the mold as is the case with brass plugs.

23. The balance technique of the Swin patents is a two-way operation. Instead of just scraping metal away from the mold, the adjustable plugs can add weight to the fan by withdrawing the adjustable plugs into its recess or decrease weight by extending the plug from the recess. Additionally, the adjustable plugs in the Swin patent are movable while the brass plug method requires that the plugs be permanently drilled into the particular position of the mold.

24. Denso, in support of its inequitable conduct claim, presented expert witnesses George Gerstman

and Dr. Charles Garris. Gerstman is a licensed patent attorney who is thoroughly experienced in the patent prosecution process but admitted that he is not an expert in injection molding technology. Dr. Garris is a professor of mechanical engineering, but has no prior experience in fan balance nor injection molding technology.

25. Gerstman conceded that he had no prior experience with injection molding equipment nor the fan balancing process. Gerstman's lack of knowledge was apparent from the fact that he did not know exactly how the brass plugs have to be drilled into molds nor how to fix the balance if brass plugs were drilled too far into the mold.

26. Gerstman admitted that the brass plug method required machining and that the Swin patent prosecution disclosed machining to the PTO. Nonetheless, Gerstman concluded that machining was material to the Swin patent because a combination of the brass plug and Gelbard method teaches the Swin method and that the PTO would not have known unless Swin disclosed this information during the patent prosecution. However, Gerstman's testimony was rebutted by Tec Air's expert witnesses Mark Newman and Dr. Brian Williamson.

27. Newman is a former patent examiner and supervisor with signatory authority within the PTO art unit which handled injection molding technology. He testified that Swin, by disclosing machining and the Gelbard method, had adequately disclosed all prior art against the Swin invention. Newman further stated that Gelbard was the most pertinent prior art. Hence, any lesser art, including machining, would be cumulative information not material to the prosecution of the Swin patent.

28. Dr. Williamson corroborated Newman's testimony, stating that the Gelbard was the best prior art and further stating that brass plugs were not material to Swin since brass plugs taught machining while Swin and Gelbard methods teach adjusting screws which is theoretically distinguishable from drilling or machining metal from the injection molds.

29. Nippondenso's other expert witness, Dr. Garris, concurred with Dr. Williamson and Mr. Newman, stating that the Gelbard method was better than brass plugs and admitted that brass plugs, unlike the Swin adjustable screws, entail a one-way operation which is disadvantageous because metal could be drilled away from the mold but never added to it. Moreover,

1998 WL 395163                                                    **Page 12**
(Cite as: 1998 WL 395163, *4 (N.D.Ill.))

Garris admitted that drilling away from metal, like machining, was dramatically different from adjusting a screw as taught by the Swin patents. Indeed, the court's interpretation of the Swin patents, adopted pursuant to Nippondenso's proposal, required that the plugs contained in each of the Swin claims must be movable. Thus, the two patents differ from brass plugs since the brass rod method requires the rods to be immobile and adjust balance by drilling.

*5 30. Patent applicants, their attorneys and representatives, and any individuals who assist them with the prosecution of a patent application have a duty not to misrepresent facts and must fully disclose all information material to the application process. Material information is information which a reasonable PTO patent examiner would consider important in allowing the application to issue as a patent.

31. In the Spring of 1975, Swin Sr. retained attorney August Roehrig to represent him in the Swin patent prosecution. In preparation for the patent prosecution, Swin, Sr., Swin, Jr., and Roehrig discussed the Swin patents and prior art which Tec Air used including, machining and brass plugs. In response to Roehrig's requests, Swin Jr. prepared drawings of the Swin invention which were used to prepare the patent applications.

32. In his first patent application, Swin, Sr. disclosed the Gelbard patent to the PTO. He acknowledged that the Gelbard patent was the best prior art and that his patents were an improvement over Gelbard. Swin also disclosed the existence of "machining," admitting that machining was a commonly utilized method for balancing fans. Moreover, Swin disclosed that the use of hub inserts was commonly known to the manufacturing process.

33. The court finds that Nippondenso's allegation that Tec Air made four material misstatements of fact in the course of the application process is without merit.

34. Nippondenso alleges that Tec Air "improperly" stated:
   a. The Gelbard patent does not teach or suggest that balance could be achieved through using a mold insert;
   b. The Gelbard patent does not teach or suggest that pins can be formed in an insert for the mold half, but rather the pins are formed in the mold half itself and are adjusted from the side of the mold half

opposite to the defining cavity.
   c. The Swin invention is distinguishable from the prior art because a single insert for many different mold halves can be made into a standard form that can be made with various shapes and configurations of molds.
   d. The Swin invention is different because adjustments to the mold cavity can be done without removing the mold from the injection molding equipment.

35. The record reveals that Tec Air made these statements to the PTO to show that the Swin invention was different from prior art because none of the prior art suggested or taught achieving balance through adjustable plugs on a mold insert supported from the mold base to form the balancing pads. Hence, Swin's adjustable plugs were not obvious and therefore were patentable.

36. The record also reveals that there is insufficient evidence to conclude that Tec Air engaged in inequitable conduct. The record reveals that the brass plug method was not material to the Swin patent since it teaches machining which is completely different from the adjustable plug method utilized by the Swin patents. At best, the brass plug method was cumulative of machining of which the PTO was aware. As such, even assuming that the brass plugs method had been disclosed, Tec Air's claims that the Swin patent are different from the existing technology was not false since the Swin patents do not utilize machining or immobile brass plugs.

*6 37. Newman also testified that the brass rod approach was easily recognizable by a person with ordinary skill in the art and clearly distinguishable from Tec Air's adjustable plugs. Hence, Tec Air did not mislead, misstate, or conceal material information related to prior art against the Swin patents.

38. Likewise, the court finds that neither Swin nor anyone remotely affiliated with the application process misled or concealed material information. Swin, Jr. testified that he candidly disclosed all material information and denied all allegations of misconduct. The Swin application did disclose machining and the Gelbard method which is indicative of lack of intent to deceive.

Conclusions of Law

39. All patent applicants have a duty of candor and good faith in his or her dealings with the PTO. 37

C.F.R. § 1.56.

40. Patent unenforceability is a statutory defense. 35 U.S.C. § 282(1).

41. A patent is unenforceable when those involved in its procurement engaged in inequitable conduct before the PTO. *See J.P. Stevens & Co. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1560-61 (Fed.Cir.1984).

42. Inequitable conduct occurs when the applicant and/or their representative misrepresents a material fact, fails to disclose material information, or submits false material information with the intent to deceive. *Pro-Mold & Tool Co., Inc. v. Great Lakes Plastics,* 75 F.3d 1568, 1575 (Fed.Cir.1996). Materiality and intent must be proven by clear and convincing evidence. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 872 (Fed.Cir.1988).

43. Applicants are not duty bound to disclose all prior art. To the contrary, applicants need only disclose prior art which is material to the examination of the patent application. Material information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. 37 C.F.R. § 1.56(a). *See LaBounty Mfg. Inc. v. U.S. Int'l Trade Comm'n,* 958 F.2d 1066, 1074 (Fed.Cir.1992). The applicant has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than information already submitted to the examiner. *Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1439 (Fed.Cir.1991).

44. In determining whether uncited prior art is more material than that before the examiner, the court focuses on the similarities, if any, between the prior art and the claims of the patent being prosecuted. *Halliburton,* 925 F.2d at 1439.

45. Inequitable conduct defense requires proof of intent which must be proven by clear and convincing

evidence. *Halliburton,* 925 F.2d at 1442; *Kingsdown Med. Consultants,* 863 F.2d at 872. Intent can be inferred if the circumstantial evidence indicates that the applicant acted with the intent to deceive. *Halliburton,* 925 F.2d at 1442.

46. Nippondenso has failed to produce clear and convincing evidence that Tec Air engaged in inequitable conduct. The Gelbard method was the best prior art against the Swin patents at the time of the Swin patents prosecution. The brass plug method was cumulative art since it is a variation of machining which Swin disclosed during the patent prosecution. Brass plugs differ from the Swin method since brass plugs entail immobile rods which are drilled into the mold, while Swin utilizes adjustable screws without cutting away the metal mold. Hence, the brass plug method was immaterial to the Swin patent since it did not teach the adjustable screw technology. Assuming the brass plugs method was material, its existence was adequately disclosed since it is a variation of machining which Swin disclosed to the PTO.

*7 47. Swin's candid disclosure coupled with the convincing testimony of his expert witnesses was clearly more persuasive than that offered by Nippondenso. Swin's disclosure of all material prior art negates any inference that he or anyone associated with the patent prosecution intentionally misled or failed to disclose information material to the patent prosecution. Accordingly, the court hereby finds that Tec Air did not engage in inequitable conduct and that the Tec Air '692 and '257 patents are therefore enforceable.

### CONCLUSION

For the reasons set forth above, the court finds that Nippondenso has failed to prove by clear and convincing evidence that Tec Air engaged in inequitable conduct with respect to its prosecution of the Swin '692 and '257 patents. Accordingly, the court finds the patents to be enforceable.

END OF DOCUMENT

1995 WL 468234
(Cite as: 1995 WL 468234 (E.D.La.))

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.

CAMECO INDUSTRIES, INC.
v.
LOUISIANA CANE MANUFACTURING, INC.

Civ. A. No. 92-3158.

July 27, 1995.

*ORDER RULING ON MOTIONS IN LIMINE AND
MOTION FOR RECONSIDERATION*

VANCE, District Judge.

*1 This matter is before the Court on defendant Louisiana Cane Manufacturing's motion for reconsideration and/or clarification of the Court's order denying, in part, and granting, in part, defendant's motion for summary judgment. The following motions in limine are also before the Court: (1) Louisiana Cane Manufacturing's motion in limine to strike the issue of commercial success; (2) Louisiana Cane Manufacturing's motion in limine to bifurcate the trial; (3) Louisiana Cane Manufacturing's motion in limine to exclude the testimony of William David Kiesal; and (4) the motion in limine of Cameco Industries, Inc. ("Cameco") to exclude evidence of Louisiana Cane Manufacturing's patent. The motions were submitted on the briefs.

I. MOTION FOR RECONSIDERATION AND/OR CLARIFICATION

Louisiana Cane Manufacturing, Inc. ("Louisiana Cane") moves the Court to reconsider and/or clarify its order granting, in part, and denying, in part, Louisiana Cane's motion for summary judgment. In support of its motion, Louisiana Cane argues that the Court "misstated the law" by holding that hypothetical claim analysis is a test for infringement under the doctrine of equivalents. Alternatively, Louisiana Cane argues that the Court erred by holding that hypothetical claim analysis may be used to determine an appropriate range of equivalents for plaintiff's patent claims. Because defendant's motion for summary judgment was not directed to the issue of whether its sugar cane harvester is equivalent to the sugar cane harvester claimed in plaintiff's patent, neither argument provides a basis for reconsideration

of the Court's order. Moreover, both arguments are simply meritless.

In its motion, Louisiana Cane argued that even if its sugar cane harvester were equivalent to plaintiff's patented invention, the doctrine of file wrapper estoppel would preclude a finding of infringement in this case. The Court rejected defendant's argument. In reaching this conclusion, the Court properly recited the test for infringement under the doctrine of equivalents as stated in *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854 (1950). The Court did not suggest that hypothetical claim analysis is a substitute for the *Graver Tank* test. Rather, the Court simply noted that despite defendant's suggestions to the contrary, plaintiff had not asserted a range of equivalents that encompassed *any* apparatus capable of two- in, two-out piling. Rather plaintiff had proposed, through a hypothetical claim, a range of equivalents that could have been allowed over the prior art and that was broad enough to cover the accused device. The Court further recognized that a hypothetical claim is a valid statement of the scope of a patent if it would have been patentable over the prior art, and the proposed range of equivalents is not otherwise limited by prosecution history estoppel. To the extent that defendant disagrees with this statement of the law, its position is contrary to controlling precedent. *Compare Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1363 (Fed. Cir. 1983), *with Conroy v. Reebok International, Ltd.*, 14 F.3d 1570, 1577 (Fed. Cir. 1994); *International Visual Corp. v. Crown Metal Manufacturing Co.*, 991 F.2d 768, 772 (Fed. Cir. 1993); *Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d 677, 684-85 (Fed. Cir.), *cert. denied*, 111 S.Ct. 537 (1990). Accordingly, defendant's motion for reconsideration is denied.

II. MOTION TO STRIKE ISSUE OF COMMERCIAL SUCCESS

*2 Louisiana Cane asks the Court to prohibit the plaintiff from introducing evidence of the commercial success of its sugar cane harvester. Louisiana Cane argues that it would be prejudicial to admit such evidence on the ground of unfair surprise, since plaintiff failed to respond fully to defendant's discovery requests, claiming that it did not intend to pursue the issue at trial. Alternatively, defendant argues that it should be allowed to conduct additional discovery on this issue. In response, plaintiff asserts

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 468234
(Cite as: 1995 WL 468234, *2 (E.D.La.))

that defendant was on notice that it intended to introduce evidence on the commercial success of its sugar cane harvester and that any failure on the part of Louisiana Cane to obtain all relevant information is the result of defendant's own neglect.

Defendant's motion was filed just prior to a trial date that has since been continued. This matter is now stayed pending a decision in *Hilton Davis Chemical Co. v. Warner-Jenkinson Co*, No. 93-1088. When the stay in this matter is lifted, a trial date will be set. In the interim between the lifting of the stay and the trial date, there will be sufficient opportunity for the parties to conduct discovery on this issue, if it is necessary to do so. Defendant's complaint of unfair surprise is therefore moot. Defendant's motion to strike the issue of commercial success is denied.

III. MOTION TO BIFURCATE

Louisiana Cane moves the Court for an order bifurcating the trial into liability and damage phases. Defendant conditions its motion on whether the Court charges the jury that it may draw an adverse inference against defendant on the issue of willfulness because defendant refused to waive its attorney-client privilege on any legal advice it received on whether its sugar cane harvester would infringe Cameco's patent. Plaintiff opposes the proposed bifurcation as unwarranted under the circumstances of the case. The burden is on the defendant to demonstrate that the trial should be bifurcated.

It is well established that a potential infringer, with actual notice of a patent, "has an affirmative duty to exercise due care to determine whether or not he is infringing. Such an affirmative duty includes, *inter alia*, the duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity." *Underwater Devices, Inc. v Morrison-Knudsen Co.*, 717 F.2d 1380, 1389-90 (Fed. Cir. 1983). If the potential infringer is later accused of infringing the patent, he can defend against a claim of willfulness by introducing evidence that he received legal advice that his invention would not be an infringement of the patent. *Kloster Speedsteel, AB v. Crucible, Inc.*, 793 F.2d 1565, 1579 (Fed. Cir. 1986). Conversely, a plaintiff can support a claim of willfulness by introducing evidence that the alleged infringer either did not seek legal advice or did so and was advised that his product would constitute an infringement. *Id.* Where, as here, a defendant refuses to disclose, on the basis of attorney client privilege, whether legal advice was

obtained, a factfinder is entitled to infer that such advice either was not obtained or that it was obtained and ignored. *See id.* at 1580; *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1572 (Fed. Cir. 1988). Accordingly, plaintiff is entitled to an adverse inference charge if it demonstrates that Louisiana Cane had actual notice of Cameco's patent rights.

*3 Having determined that plaintiff may be entitled to an adverse inference charge, the Court must consider whether defendant is then entitled to a bifurcation of the trial. Louisiana Cane asserts that an adverse inference charge on the issue of willfulness would prejudice the jury against it on the issue of liability. In *Quantum Corp. v. Tandon Corp.*, 940 F.2d 642 (Fed. Cir. 1991), the Federal Circuit provided the following guidance on whether the issue of willfulness should be bifurcated:

An accused infringer ... should not, without the trial court's careful consideration, be forced to choose between waiving the privilege in order to protect itself from a wilfulness finding, in which case it may risk prejudicing itself on the question of liability, and maintaining the privilege, in which case it may risk being found to be a willful infringer if liability is found. Trial courts should thus give serious consideration to a separate trial on willfulness whenever the particular attorney client communications once inspected by the court *in camera*, reveal that the defendant is indeed confronted with this dilemma.

*Id.* at 643-44. The defendant has not submitted any documents for *in camera* inspection from which the Court can determine whether defendant is confronted with the "dilemma" noted by the Federal Circuit. Absent such evidence, and because no other basis for bifurcation has been advanced, defendant has failed to carry its burden of establishing that bifurcation is warranted. The motion for bifurcation is therefore denied.

IV. MOTION TO EXCLUDE TRIAL TESTIMONY

Plaintiff proposes to introduce expert testimony on the following subjects: (1) background information about how patents are examined and issued; (2) whether modifications in plaintiff's claims made during the prosecution of the patent had any effect on the scope of plaintiff's patent; (3) prior art limitations on the scope of plaintiff's patent; (4) how plaintiff's patent claim should be construed under the doctrine of equivalents; (5) a hypothetical claim and what it

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 468234
(Cite as: 1995 WL 468234, *3 (E.D.La.))

means; (6) infringement; and (7) a reasonable royalty. Louisiana Cane raises two objections to the proposed testimony. First, Louisiana Cane contends that the proposed testimony will amount to a jury charge. Second, defendant argues that plaintiff's expert is not qualified to give an expert opinion because he has no technical expertise in the relevant art and because he has no accounting or finance experience. Cameco contends that defendant's objections should be overruled because expert testimony is regularly received in patent trials, and its expert is qualified to render an opinion based on his extensive experience as a patent attorney with mechanical inventions.

Opinion testimony is admissible from a witness "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Advisory Committee Note accompanying Rule 702 of the Federal Rules of Evidence provides that an expert includes persons with formal training and also those whose experiences allow them to testify with authority on a particular subject. *Christopheresen v. Allied-Signal Corp.,* 939 F.2d 1106, 1110 (5th Cir. 1991). Once it is established that a witness is generally qualified to render an expert opinion, the degree to which the witness is qualified goes to the weight of that witness's testimony, not its admissibility. *Peteet v. Dow Chemical Co.,* 868 F.2d 1428, 1431 (5th Cir. 1989); *Yamaha International Corp. v. Hoshino Gakki Co.,* 840 F.2d 1572, 1582-83 (Fed. Cir. 1988).

*4 Plaintiff's expert has a B.S. in mathematics, an M.S. in nuclear energy, and a law degree. He has practiced patent law for over twenty years and has served as an adjunct professor at Louisiana State University School of Law, where he taught a course in patent law. By affidavit, plaintiff's expert further states that his nuclear energy degree emphasized various aspects of mechanical engineering and that he has expanded his background in mechanical engineering through his patent law practice. Plaintiff's expert further states that he has been qualified as an expert in several other patent cases in which he rendered opinions related to the issues raised in this case.

The Court finds that the expert's education and background are sufficiently related to the subject matter of plaintiff's patent to allow him to speak with authority on the issues of validity and infringement. The Court further finds that the expert's experience as a patent attorney provides him with sufficient

familiarity with royalty agreements to be able to render an opinion about what a reasonable royalty would have been under the circumstances of this case. The Court will therefore not exclude plaintiff's expert on the grounds that he is unqualified to render an expert opinion. Defendant is free, however, to inquire into his qualifications on cross-examination to support its argument that his opinion should be accorded little, if any, weight.

Louisiana Cane has raised the defense of inequitable conduct. In response, plaintiff intends to elicit testimony from its expert about the patent application process, the operations and functions of the patent and trademark office, and the materiality of relevant prior art. Plaintiff argues that such testimony will be helpful to the "jury" in understanding why the inventor did not act inequitably in prosecuting the patent at issue. Plaintiff's contentions notwithstanding, the disputed issues of fact underlying the defense of inequitable conduct are not jury questions but are to be resolved by the Court. *General Electric Music Corp. v. Samick Music Corp.,* 19 F.3d 1405, 1408 (Fed. Cir. 1994). That aside, the Court finds that the proposed testimony of plaintiff's expert is relevant and that it would be admissible to rebut Louisiana Cane's inequitable conduct defense. *See id.* at 1409 n.2; *accord Thermal Systems Corp. v. Clean Air Systems,* 706 F. Supp. 436, 447 (W.D.N.C. 1987). The Court will restrict the testimony to the extent it proves to be unhelpful or cumulative.

Plaintiff argues that it should also be allowed to elicit expert testimony on the issue of file wrapper estoppel. Specifically, plaintiff proposes to have its expert render an opinion as to whether amendments made to claims during the prosecution of the patent had any effect on the scope of the patent. The scope of a patent and whether it is limited by file wrapper estoppel are issues that are decided by the Court. The Court finds that the expert testimony proposed by the plaintiff on the issue of file wrapper estoppel would not be helpful. Such a determination can be made without the assistance of an expert. The Court therefore grants defendant's motion to the extent that it seeks to exclude an expert opinion on the issue of file wrapper estoppel.

*5 Plaintiff also intends to introduce expert testimony in support of its claim of infringement under the doctrine of equivalents. Specifically, plaintiff's expert will propose a hypothetical claim that he contends would have been patentable over the

prior art and that encompasses defendant's machine. Plaintiff states that its expert's testimony will be based on facts already placed in evidence through the testimony of a technical expert. Plaintiff's expert will also give his opinion on the ultimate question of infringement. In response to defendant's motion, plaintiff states that the proposed expert testimony will not consist of a recitation of the *law* regarding the doctrine of equivalents and thus will not be a disguised jury charge.

Before a jury can be charged on infringement under the doctrine of equivalents, the party asserting infringement must present evidence concerning the doctrine and each of its elements. *See Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1425-26 (5th Cir. 1989). Plaintiff is therefore free to inform the jury of the evidence that establishes the equivalence of the claimed and the accused device for each element of the *Graver Tank* test, and it may do so through expert testimony. *Texas Instruments, Inc. v. United States International Trade Commission*, 805 F.2d 1558, 1568 (Fed. Cir. 1986). That plaintiff's expert is an attorney does not disqualify him from offering an opinion. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 991 n.4 (Fed. Cir. 1995) (Mayer, J., concurring).

Finally, plaintiff intends to elicit expert testimony on the proper royalty for any infringement. Expert testimony on the issue of damages is specifically authorized under 35 U.S.C. § 284 ("The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances."). The Court has already determined that the expert's prior experience with patents will likely assist the trier of fact in arriving at a reasonable royalty if plaintiff is so entitled. The proposed testimony is therefore admissible.

## V. MOTION TO EXCLUDE EVIDENCE OF LATER ISSUED PATENT

In its only motion before the Court, Cameco objects to the introduction of a patent issued on defendant's sugar-cane harvester in 1994, two years after the commencement of this lawsuit. Plaintiff contends that introduction of the patent would be prejudicial and confusing to the jury and that it is irrelevant to whether defendant's machine infringes its patent. Defendant responds that the patent is relevant to whether its device is equivalent to the machine claimed in plaintiff's patent. Specifically, defendant

argues that the issuance of a patent for its sugar cane harvester is evidence that the machine is so changed from plaintiff's invention that it performs the same function in a substantially different way.

In support of its argument, defendant cites the Supreme Court's decision in *Kokomo Fence Machine Co. v. Kitselman*, 189 U.S. 8, 23 S.Ct. 521 (1903). In *Kitselman*, the Supreme Court indicated that there is a presumption that an accused device is substantially different from the invention it is accused of infringing when a patent has been issued on the accused device. *Id.* at 23, 23 S.Ct. at 527. This rule of law has not passed the test of time. Rather, in *Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 750 F.2d 1569 (Fed. Cir. 1984), the Federal Circuit relied on a subsequent Supreme Court decision to hold that a presumption of noninfringement does not arise from the issuance of a patent on an accused device. *Id.* at 1581. This Court is bound by the Federal Circuit's interpretation of Supreme Court precedent.

*6 Having determined that the issuance of a patent is not presumptive evidence of noninfringement, defendant must show that it is relevant in some other way. To this end, Louisiana Cane argues that the patent is relevant because the application submitted in support of the patent details differences between its machine and the machine claimed in plaintiff's patent. However, Louisiana Cane concedes that this same information can be presented through other means. The introduction of the patent or patent application to demonstrate the differences between the two machines would therefore be cumulative. Moreover, the Court finds that admission of the patent or patent application would be unfairly prejudicial to the plaintiff, as this evidence is likely to give the jury the false impression that a patent on the accused machine means that it is substantially different from the machine claimed in plaintiff's patent. Most importantly, however, the Court finds that admission of Louisiana Cane's patent into evidence would shift the focus of the trial from the validity and infringement of Cameco's patent to the validity of Louisiana Cane's patent. A detour of this sort would be only distracting and confusing to the jury, while providing little, if any, relevant information. The Court therefore grants plaintiff's motion to exclude evidence of Louisiana Cane's later issued patent. *See Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1572 (Fed. Cir. 1986). Accordingly,

IT IS ORDERED that Louisiana Cane's Motion for

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 468234
(Cite as: 1995 WL 468234, *6 (E.D.La.))

Reconsideration is hereby DENIED.

IT IS FURTHER ORDERED that Louisiana Cane Manufacturing's motion in limine to strike the issue of commercial success is hereby DENIED.

IT IS FURTHER ORDERED that Louisiana Cane Manufacturing's motion in limine to bifurcate the trial is hereby DENIED.

IT IS FURTHER ORDERED that Louisiana Cane Manufacturing's motion in limine to exclude the testimony of William David Kiesal is hereby GRANTED, in part, and DENIED, in part.

IT IS FURTHER ORDERED that Cameco Industries' motion in limine to exclude evidence of Louisiana Cane Manufacturing's patent is hereby GRANTED.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 608525
(Cite as: 1995 WL 608525 (N.D.Ill.))
H

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Ashley ROBINSON, a minor by Her Next Friend, Tina ROBINSON, Her Legal and Natural Guardian, Plaintiff,

v.

Joseph THOMAS, M.D. and the City of Harvey, Defendants.

No. 93 C 4037.

Oct. 11, 1995.

*MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

**\*1** Presently pending before this Court are several motions *in limine* that have been filed by the parties in preparation for the trial of this case which is scheduled to begin on October 23, 1995. This medical malpractice action involves allegations of negligent prenatal care rendered by defendants Joseph Thomas, M.D. ("Dr. Thomas") and the City of Harvey to Tina Robinson, mother of plaintiff Ashley Robinson ("Robinson"). [FN1] Robinson alleges that she suffers from Erb's paralysis and shoulder dystocia as a result of defendants' negligence. Robinson further alleges that both defendants acted in a manner rising to the level of willful and wanton misconduct in connection with the prenatal care of Tina Robinson. Plaintiff claims that her injuries have caused her and will cause her in the future to incur medical expenses, pain and suffering, loss of wages, and emotional distress. Jurisdiction is founded on diversity of citizenship, pursuant to 28 U.S.C. § 1332 . Robinson is a resident and citizen of the State of Indiana and both defendants are citizens of the State of Illinois.

*STANDARDS*

Federal district courts have the power to exclude evidence *in limine* pursuant to their authority to manage trials. *Luce v. United States,* 469 U.S. 38, 41 n.4 (1984). A motion *in limine* to exclude evidence should be granted only if the evidence sought to be excluded is clearly inadmissible for any purpose. *Plair v. E.J. Brach & Sons, Inc.,* 864 F. Supp. 67, 69 (N.D. Ill. 1994). Guidelines governing motions *in*

*limine* were clearly set forth in *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F. Supp. 1398 (N.D. Ill. 1993), as follows:

This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds.... Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.... Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine.*

*Id.* at 1400-01 (citations omitted).

A ruling on a motion *in limine* is interlocutory in nature and subject to change during the course of the trial. 75 Am. Jur. 2d Trial § 94, (1991 & Supp. 1995).

With these evidentiary guidelines in mind, we turn to the individual motions before the court.

*Robinson's Motion* in Limine *to Exclude Evidence of Plaintiff's Indiana Malpractice Proceedings*

In general, Robinson seeks to exclude any evidence relating to the fact that the Robinson's filed malpractice proceedings in Indiana against the physician who delivered Ashley, the nurses who assisted in Ashley's delivery, and the hospital where Ashley was delivered. In particular, Robinson seeks to exclude:

**\*2** [A]ny mention that any lawsuit was filed against said individuals, or the introduction of, or reference to, any pleadings, papers, affidavits (including the Affidavit of Tina Robinson), depositions, answers to interrogatories, or any other matter connected with said case filed before the Indiana Department of Insurance.

Pl.'s Motion at 1. Robinson argues that any such evidence is irrelevant to the present case against Dr. Thomas and the City of Harvey, or, alternatively, would be unfairly prejudicial because it would confuse or prejudice the jury.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 608525
(Cite as: 1995 WL 608525, *2 (N.D.Ill.))

Dr. Thomas seeks to introduce portions of these proceedings--wherein Tina Robinson allegedly made evidentiary admissions amounting to prior inconsistent statements with respect to the allegations made in the instant case. Dr. Thomas wishes to use these prior inconsistent statements for impeachment. Specifically, Dr. Thomas seeks to introduce the following Indiana litigation documents into evidence in this case: 1) plaintiff's proposed complaint; 2) plaintiff's panel submission; 3) Tina Robinson's affidavit; and, 4) Tina Robinson's answers to interrogatories.

For the purposes of deciding this pending motion, the Court finds that pleadings which Tina Robinson personally verified, such as her affidavit and answers to interrogatories are relevant to this case as prior inconsistent statements. Additionally, the Court finds that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. However, the actual filing of a lawsuit against other parties in another jurisdiction is not relevant to the issues in this case.

Therefore, admissions made by Tina Robinson in the Indiana proceedings may be used to impeach her testimony. This conclusion is subject to the condition that Thomas may not introduce any actual evidence that the Indiana defendants committed any negligence in the delivery of Ashley without the prior approval of the Court. Thomas must, of course, also lay a proper foundation for the use of any admissions by Tina Robinson by showing that they were in fact adopted by her. Accordingly, Robinson's motion will be granted in part and denied in part.

*Plaintiff's Motion* in Limine *to Exclude Evidence that Tina Robinson Was Negligent in Her Prenatal Care*

Robinson seeks generally to exclude any evidence that Tina Robinson was negligent in her prenatal care for Ashley. Robinson argues that under Illinois law, which the parties do not dispute governs this case, any negligence of a parent cannot be imputed to the child. *See Vonbehren v. Bradley*, 266 Ill. App. 3d 446 (4th Dist. 1994) *reh'g denied and cert. denied* 159 Ill. 2d 582 (1995); *Sheley v. Guy*, 29 Ill. App. 3d 361 (4th Dist. 1975) *aff'd* 63 Ill. 2d 544 (1976). Dr. Thomas replies that evidence concerning information conveyed (or not conveyed) by Tina Robinson to her medical-care providers regarding her prior pregnancy conditions and medical history may bear directly on whether she properly related vital

information to her health care providers.

**\*3** The Court agrees that as a general rule, Illinois law provides that "[t] he negligence, if any, on the part of the [parent] cannot be imputed to [his or her child]. *Sheley*, 29 Ill. App. 3d at 366 (citing *Duffy v. Cortesi*, 2 Ill. 2d 511 (1954)); *Rahn v. Beurskins*, 66 Ill. App. 2d 423, 430 (4th Dist. 1966). However, that general rule relates to the issue of whether a plaintiff's contributory negligence will reduce the amount of award to which she is entitled. That is not the relevant issue here. If it turns out, as Dr. Thomas suggests, that Robinson's claims "center on the issue of whether the Harvey Clinic personnel properly ascertained and documented vital information" about Tina Robinson's prior pregnancy conditions, then evidence as to whether Tina Robinson failed to provide such information upon inquiry may, indeed, be directly relevant to the issue of Thomas' liability. Plainly, the information provided by his patient is relevant to the issue of Dr. Thomas' negligence. The function of such evidence here is not to impute Tina Robinson's negligence to the plaintiff Ashley; rather, it serves to shed light on the information known to the defendants. Thus, to the extent that Dr. Thomas seeks to introduce evidence directly relating to information (or the lack thereof) provided by Tina Robinson, plaintiff's motion to exclude evidence as to Tina's negligence is denied. As to any other alleged negligent conduct by Tina Robinson, the Court cannot rule in the abstract. Rather specific proffers of evidence will be considered individually during the course of trial. Accordingly, plaintiff's motion to exclude evidence of Tina Robinson's negligence is denied.

*Dr. Thomas' Motion* in Limine *to Bar Evidence of Fraud and Improper Billing of Insurance and Medicaid Forms*

Dr. Thomas seeks to exclude any evidence that he fraudulently and improperly submitted insurance and Medicaid forms while working under contract with the Harvey Board of Health Clinic. Thomas contends that any evidence alleging that he committed fraud would be highly prejudicial and would tend to inflame the jury against him; therefore, it should be excluded. Federal Rule of Evidence 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403.

The plaintiff seeks to introduce the insurance claim

1995 WL 608525
(Cite as: 1995 WL 608525, *3 (N.D.Ill.))

form that lists Dr. Thomas as the physician requesting reimbursement and is signed by Dr. Thomas to establish that a physician-patient relationship existed between Dr. Thomas and Tina Robinson-an issue that is in dispute. *See* Final Pretrial Order, Statement of Contested Issues, ¶ 16. Plaintiff also states that the claim form is a part of her medical records from the Harvey Board of Health and that all sides have stipulated to the admission of such records into evidence. Plaintiff also argues that she is entitled to examine Dr. Thomas as to whether he satisfied himself that she received the care indicated on the form, noting that the form states, "My signature on the reverse side of this bill certifies that all entries on this claim form are true, accurate and complete." Plaintiff contends that this evidence goes to Dr. Thomas' negligence not whether he committed fraud in his billing practices.

*4 Plaintiff's latter argument is without merit. The insurance claim form does nothing to establish the parameters of Dr. Thomas' duty of care to the plaintiff. The provision stating that the signor had reviewed the entries on the form and that the same are true accurate and complete is designed to prevent billing abuse not establish duties owed by the doctor to the patient. Nevertheless, plaintiff's first argument has merit. The Court finds that the contested evidence is relevant and admissible solely to establish whether a physician-patient relationship existed between Tina Robinson and Dr. Thomas. The resolution of this contested issue is clearly important to the merits of this case. However, plaintiff may not introduce her insurance claim form, or those of anyone else, to argue or suggest that Dr. Thomas committed fraud or improperly submitted insurance or Medicaid forms. [FN2] Accordingly, Dr. Thomas' motion is denied on the express condition that the plaintiff will be precluded from arguing that these exhibits are proof of any alleged fraud.

*Dr. Thomas' Motions* in Limine *to Strike Allegations and Exclude Evidence of Willful and Wanton Misconduct and that They Acted With Willful and Wanton Disregard*

Dr. Thomas seeks to strike any and all allegations that his conduct was willful and wanton or that he acted with willful and wanton disregard to Tina Robinson's health and medical treatment. Dr. Thomas asserts that plaintiff fails to establish through factual evidence that he engaged in willful or wanton misconduct with respect to her care and treatment. He also argues that plaintiff has no expert opinion

upon which a finding of willful and wanton misconduct could be based. Finally, he argues that any probative value of such evidence would be substantially outweighed by the danger of unfair prejudice. [FN3]

Dr. Thomas argues that even if Tina Robinson did disclose her problems with high blood sugar in her previous pregnancies, a medical decision was made by the nurse practitioner and this information was not disclosed to either Dr. Thomas or the Harvey Board of Health. Thus, they could not have consciously disregarded this information to the detriment of Tina Robinson's health and medical treatment.

In response, plaintiff asserts that she will establish at trial that: 1) Thomas failed to supervise nurse practitioners and the other employees of the Board of Health; 2) Thomas failed to direct adequate testing and did not adequately review Tina Robinson's medical records; and 3) Thomas failed to personally examine Tina Robinson. Plaintiff submits that these facts establish that the conduct of both defendants rose to the level of willful and wanton misconduct.

A plaintiff's burden of proof for willful and wanton misconduct requires that the "plaintiff establish that the defendant[s] had knowledge of a situation requiring due care to avert injury, the ability to avoid the harm, and an omission to use care and diligence to avert the harm." *Ferguson v. Kasbohm,* 131 Ill. App. 3d 424, 429 (1st Dist. 1985). Generally, willful and wanton misconduct requires a "conscious choice of a course of action, either with the knowledge of the serious danger to others involved in it or with knowledge of facts which disclose this danger to any reasonable man." *Burke v. 12 Rothchild's Liquor Mart,* 148 Ill. 2d 429, 449 (1992) (citing Restatement (Second) of Torts § 500, Comment g at 590 (1965)).

*5 Additionally, it is worth noting that "the willful and wanton misconduct claim requires an additional showing [above that of negligence] that the defendant acted with intentional or conscious disregard for the plaintiff's safety, rather than merely carelessly." *Russell v. Good Shepard Hospital,* 222 Ill. App. 3d 140, 146 (2d Dist. 1991); *Riley v. Physicians Weight Loss Centers Inc.,* 192 Ill. App. 3d 23, 32 (1989). However, a sufficient showing of wilful and wanton misconduct has been found where there is "a failure after knowledge of impending danger, to exercise ordinary care to prevent [injury or harm] or a failure to discover the danger through recklessness or carelessness when it could have been discovered by

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 608525
(Cite as: 1995 WL 608525, *5 (N.D.Ill.))

ordinary care." *Jackson v. Chicago Board of Education,* 192 Ill. App. 3d 1093, 1100 (1st Dist. 1989) (quoting *Lynch v. Board of Education, Collinsville Community Unit School District 10,* 82 Ill. 2d 415, 429 (1980)); *see also Beasley v. St. Mary's Hospital of Centralia,* 200 Ill. App. 3d 1024, 1036 (5th Dist.) *cert. denied,* 135 Ill. 2d 554 (1990); *Koh v. Village Greens,* 158 Ill. App. 3d 226, 231 (2d Dist. 1987).

The question of whether a defendant is liable for willful and wanton behavior is usually a question for the jury, but whether willful or wanton behavior exists may be appropriately decided as a question of law. *Canning v. Barton,* 264 Ill. App. 3d 952, 955 (1st Dist. 1994). While this issue is close in this case, the Court has determined that the allegation that Dr. Thomas never saw Tina Robinson in her five visits to the Clinic for prenatal care, coupled with the allegations that Dr. Thomas repeatedly failed to show up for his scheduled hours at the Clinic; that Tina Robinson properly disclosed her prior difficulties with high blood sugar in previous pregnancies; that there was an improper review of Tina Robinson's medical records; and that the clinic staff was not adequately trained, are sufficient to survive this motion at this early stage in the proceedings. At this preliminary stage in the litigation, the Court finds that plaintiff's allegations, if proven, may warrant the possibility of submitting the issue of willful and wanton misconduct by Dr. Thomas to the jury. This Court is not able to conclusively determine at this time that there are no facts upon which a reasonable jury could find that the defendants exhibited willful and wanton disregard for Tina Robinson's prenatal care. Therefore, Dr. Thomas' motion to strike allegations and exclude evidence that they acted in a willful and wanton manner in the prenatal care of Tina Robinson is denied. However, the Court will carefully evaluate the evidence over the course of the trial and will reevaluate this issue at the end of plaintiff's case.

*Dr. Thomas' Motion in Limine to Bar Plaintiff from Introducing Repetitive and Cumulative Expert Testimony*

Dr. Thomas seeks to bar any repetitive and cumulative expert testimony from plaintiff's medical experts. Essentially, Dr. Thomas seeks to prevent the jury from improperly inferring that plaintiff's case is entitled to more weight because she has two medical experts--Dr. David Zbaraz and Dr. Srbislav Brasovan. The plaintiff indicates in response that she intends to rely primarily on the testimony of Dr. Zbaraz at trial and then call Dr. Brasovan to supplement this testimony on any matters left open by Dr. Zbaraz' testimony.

**\*6** The Court must note at the outset that Local Rule 5, footnote 7, limits each party to one expert witness to testify on each subject except where good cause is shown. [FN4] After reviewing the briefs of the parties on this issue, the Court will preliminarily accept plaintiff's second expert witness on the express condition that Dr. Brasovan will testify only to supplemental matters not covered by Dr. Zbaraz' testimony. The Court will not allow Dr. Brasovan to testify as to matters which are duplicative or cumulative. Therefore, the Court will grant Dr. Thomas' motion to the extent that both experts will not be allowed to testify in a duplicative or cumulative fashion.

*Dr. Thomas' Motion to Bifurcate the Trial*

Rule 42(b) permits bifurcation of any issues for separate trial where such separation is "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1166 (7th Cir.), *cert. denied,* 464 U.S. 891 (1983). Only one of these criteria need be met to justify bifurcation. *Id.*

The decision to bifurcate the issues of liability and damages for separate trials is committed to the sound discretion of the trial court. *Davis v. Freels,* 583 F.2d 337, 343 (7th Cir. 1978); *Keyes Fibre Co. v. Packaging Corp. of America,* 763 F. Supp. 374, 375 (N.D. Ill. 1991).

In this case, the overwhelming prejudice to the defendants of defending liability and damages before the jury at the same time alone would justify a bifurcated proceeding. Additionally, this Court finds that the court time and related expense that potentially can be saved also justifies a bifurcated proceeding.

The court is persuaded that bifurcation of the liability and damages phases will best serve the goal of an efficient and expedient trial. Accordingly, the court grants defendants' motion to bifurcate the liability and damages phases of this trial, with the understanding that the damages phase will begin immediately, before the same jury, if the plaintiff

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 608525
(Cite as: 1995 WL 608525, *6 (N.D.Ill.))

Page 35

succeeds in establishing liability.

### CONCLUSION

Plaintiff's motion *in limine* to exclude evidence relating to her lawsuits against the Indiana physician, nurses, and hospital who delivered Ashley, is denied provided that defendants must lay a proper foundation for their evidence and use only sworn admissions from Tina Robinson as impeachment material. Plaintiff's motion to exclude evidence of Tina Robinson's negligence during her pregnancy is denied. Defendant Thomas' motion to bar evidence that he committed fraud and improperly submitted insurance and Medicaid forms is granted; however, plaintiff may use the forms submitted for her care for purposes of establishing the existence of a physician-patient relationship between Tina Robinson and Dr. Thomas. Defendant Thomas' motion to exclude evidence of willful and wanton misconduct is denied; however, the Court will carefully consider the evidence adduced during plaintiff's presentation of her case and will reevaluate this motion at the close of plaintiff's case. Defendant's motion to exclude duplicative and cumulative expert testimony from plaintiff's medical experts is granted pursuant to Local Rule 5--although both experts will be allowed to testify, the Court will not allow duplicative expert testimony. Finally, this Court grants Dr. Thomas' motion to bifurcate the trial of this case.

FN1. On October 10, 1995, as the Court was preparing to issue this Opinion, the parties contacted the Court and indicated that the City of Harvey and the plaintiff have reached a settlement. Consistent with this Court's usual practice, the Court will enter an Order dismissing Robinson's claims against the City without prejudice pending submission of the appropriate documents to the Court at which time Robinson's claims against the City will be dismissed with prejudice. Accordingly, this Opinion will not address those motions *in limine* submitted only by the City. Those motions *in limine* with respect to which both defendants have joined will, of course, be addressed.

FN2. If Plaintiff chooses to make an issue of fraud and improper submission of insurance and Medicaid forms by Dr. Thomas during his cross- examination, pursuant to Federal Rule of Evidence 608(b), she still cannot introduce extrinsic evidence. Specifically, Fed. R. Evid. 608(b) states:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, ...

FN3. The Illinois Tort Immunity Act, 745 ILCS 10/ 1-210 (West 1992), defines willful and wanton misconduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows utter indifference to or conscious disregard for the safety of others or their property."

FN4. Specifically, Local Rule 5 states, "Only one expert witness on each subject for each party will be permitted to testify absent good cause shown. If more than one expert witness is listed, the subject matter of each expert's testimony shall be specified."

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works